THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARYULES BIVENS, Defendant-Appellant.

First District (5th Division)   No. 83—2354

Opinion filed November 13, 1987.

Peter C. Rolewicz, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Richard A. Stevens, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

On appeal from his murder and armed robbery convictions, after a jury trial, defendant, Aryules Bivens, contends: (1) the trial judge erred in denying his motion to quash his arrest and suppress the evidence; (2) he was denied his constitutional right to effective assistance of counsel; (3) he was denied a fair trial because of improper prosecutorial comments during trial; (4) his natural-life imprisonment sentence for the murder was an abuse of the trial court's discretion; and (5) the 60-year consecutive, extended-term imprisonment sentence for the armed robbery was improper.

The trial evidence established the following. In the early morning of September 12, 1982, Kelvin Coleman, the 22-year-old hearing-impaired victim, was shot and killed in the presence of his mother, Ms. Clara Coleman, in front of his apartment door during the commission of an armed robbery.

On September 11, 1982, around 10 p.m. Kelvin Coleman left his apartment at 733 East Bowen in Chicago. Kelvin shared the apartment with his mother, Ms. Clara Coleman. When Kelvin left he was wearing a watch and his hearing aid. Kelvin was also carrying his wallet, which contained pictures of his nieces, a CTA bus card, a voter's registration card and his Illinois State identification card. Because of Kelvin's hearing impairment, his mother checked to be certain that he had his wallet with him before he left the apartment.

On September 12, 1982, around 1 or 1:30 a.m., Ms. Coleman awakened to loud noises. Ms. Coleman got out of bed and looked out the window, where she saw Robert Ingram, Phillip Nicks and Gerald Jones. Two of these men were engaged in a fight. Ms. Coleman watched the fight for about 15 minutes and then returned to bed, where she lay awake.

Around 4 a.m., Ms. Coleman heard a gunshot, some footsteps and a moaning sound. Ms. Coleman rushed to the front door, opened it, and saw her son Kelvin moving backwards with his hands waving in the air. Coming towards him with a black barreled gun was the defendant, Aryules Bivens. Kelvin fell, the defendant pointed the gun at Kelvin's chest and fired. Ms. Coleman exclaimed, "Why are you shooting my son?" and "What has he done to you?" The defendant

stared at Ms. Coleman and then fled down the stairs. Ms. Coleman kneeled over her son. Ms. Coleman testified that at that time her son was not wearing his hearing aid or his watch.

Ms. Coleman testified that she had ample opportunity to view the defendant from a distance of three to four feet in a well-lighted hallway during the incident. Ms. Coleman also testified that she observed defendant's face when she opened her front door, when the defendant was approaching Kelvin, and when the defendant stared at her after shooting Kelvin. She stated that there were three lights on in the hallway and the lighting conditions were good.

Ms. Coleman described the defendant as wearing a greenish, short-sleeved shirt, jogging pants, a medium curly hairstyle, a slight mustache, and sideburns which went below his earlobe and were even with his upper lip.

Around 7:30 a.m., Ms. Coleman was taken to the 51st Street police station to view a lineup but she did not identify the offender. Later that evening, Ms. Coleman was shown photographs and she identified the defendant's picture as the offender. On January 5, 1983, Ms. Coleman identified the defendant from a lineup at the 51st Street police station. During trial the defendant was again identified by Ms. Coleman as the offender.

At trial, Detective Michael Pochordo testified that on September 12, 1982, he was assigned to follow up the murder investigation of Kelvin Coleman. Pochordo went to the county morgue and then to the victim's apartment. After leaving the victim's apartment, Pochordo went to the Nicks' apartment. The record reveals that the Nicks' apartment was on the floor beneath the apartment of Ms. Coleman and the deceased. The record also discloses that Ms. Coleman knew Phillip Nicks and had seen him earlier that night in front of the building engaged in a fight. Pochordo did not state the reasons he went to the Nicks' apartment. Pochordo did testify, however, that while in the Nicks' apartment he spoke with Phillip's brother, Johnny Nicks, and their mother. Pochordo left the Nicks' apartment but later returned and departed with Phillip Nicks. The record is silent as to why he did so. It appears that the Nicks brothers were then suspects in Kelvin's robbery-murder, although the record does not indicate why. Whether it was because Kelvin told his mother that the Nicks brothers were involved is not disclosed. Officer Pochordo testified that Phillip Nicks was not under arrest and that Nicks voluntarily accompanied him to the police station.

Detective Jean Romic, another investigating officer in the case, testified that on the evening of September 12, 1983, she was assigned

the follow-up investigation of the Coleman murder. Among the photographs shown Ms. Coleman by Detective Romic, Ms. Coleman identified the defendant's picture as that of the offender. Romic then spoke with Phillip Nicks. Phillip Nicks directed the officers to a location one-half block from the murder scene. At this location, the following evidence was recovered: the victim's CTA special pass, voter's registration card and photographs of the victim's nieces. The victim's Illinois State identification card was discovered in a nearby dumpster. Romic testified that the crime laboratory and Detectives Regan and Glynn were then called.

Detective Regan testified that after being called to the scene of the recovered evidence, he and his partner left with Phillip Nicks. Phillip Nicks voluntarily directed the officers to a prairie located three to four blocks from the murder scene. At this location the murder weapon, a .38 caliber revolver, was recovered.

On September 13, 1982, Johnny Nicks voluntarily went to the Area One Violent Crimes office and in the presence of Assistant State's Attorney Rick Mottweiler gave a court-reported statement. A warrant was then issued for defendant's arrest.

On January 5, 1983, defendant was arrested for a traffic violation. He was transported to the Area One Violent Crimes office. Officer Pochordo testified that after giving defendant his *Miranda* warnings, the defendant stated he was with the Nicks brothers, Johnny Nicks and Phillip Nicks, on the night of the armed robbery and murder. The defendant stated that as he and the Nicks brothers were walking down the street, Phillip Nicks pointed to the victim and stated, "There is a boy you can rob." Johnny Nicks followed the victim home. Defendant and Phillip Nicks waited 5 to 10 minutes and then followed. As they approached the building defendant observed the victim and Johnny Nicks. The victim was against the wall and Johnny Nicks pressed the black barreled gun against the back of the victim's head. Defendant observed Johnny Nicks patting down the victim's pockets. As defendant stepped back to observe if there were any witnesses, he heard a shot. Defendant stated that Johnny Nicks ran down the stairs exclaiming, "I just shot a stud." Defendant took the gun from Johnny Nicks and reminded him of the hazards of leaving witnesses. Defendant returned the gun to Johnny Nicks. Johnny Nicks went back upstairs and the defendant stated he heard several shots and a scream. When Johnny Nicks returned, defendant took the gun and a CTA pass. Defendant later threw the gun in the grass and the CTA pass into the garbage.

Pochordo testified that defendant later gave the same statement

in the presence of Assistant State's Attorney Dean Morask.

Assistant State's Attorney Dean Morask testified that he was present in the interview room when defendant was advised of his *Miranda* rights and indicated that he understood them. The defendant then repeated the statement he had previously made to Officer Pochordo. The statement was reduced to writing and signed by the defendant.

On behalf of the defense Margaret Bivens, defendant's sister, testified that on September 12, 1982, it was Johnny Nicks who wore a greenish T-shirt and not the defendant. Ms. Bivens testified that defendant was wearing a bluish-gray T-shirt. Ms. Bivens further testified that she never observed defendant with a mustache or sideburns.

Charlotte White, also defendant's sister, testified that on September 12, 1982, defendant was wearing a blue and gray sweat shirt with a T-shirt underneath it. Contrary to her sister, Ms. White testified that defendant had no mustache on that date; however, prior to that date defendant did wear a mustache. Ms. White further testified that prior to September 12, 1982, defendant's sideburns were smaller.

The jury found defendant guilty of murder and armed robbery.

On September 9, 1983, defendant's sentencing hearing was held. In aggravation, the State presented defendant's criminal background and the testimony of Ms. Annie Taylor and Officer Everett Johnson.

Defendant's criminal history dated back to January 21, 1980, when he was convicted of burglary and sentenced to two years' probation, with 10 days' imprisonment and a restitution payment of $375. On May 19, 1980, he was convicted for the commission of a robbery committed on March 17, 1980, and was sentenced to three years in the Illinois Department of Corrections, from which sentence he received his mandatory release on October 14, 1981.

Ms. Annie Taylor testified that on January 4, 1983, about 9 p.m., she was abducted and robbed at gunpoint by the defendant while returning home from work. Ms. Taylor observed defendant as she stepped out of her 1979 Ford Grenada car. The defendant pointed a gun at her, ordered her back into the car, entered the car himself, and sat in the driver's seat. There he took Ms. Taylor's purse, wallet, money, and her automobile identification papers. The defendant drove down an alley with Ms. Taylor in the car. Ms. Taylor jumped out of the car, ran home and called to report the robbery to the police. Later, during the early hours of the following morning, the police went to her home and took her to a police station on the south side of Chicago, where she identified the defendant in a lineup as the person who had robbed her.

Chicago police officer Everett Johnson testified at the sentencing hearing that he arrested the defendant, who was driving Ms. Taylor's automobile, after a high speed chase which culminated in the defendant's colliding with another car. In Ms. Taylor's car with the defendant were Ms. Taylor's purse, personal and automobile identification documents. Officer Johnson further testified that he seized a snubnose, nickel-plated toy gun, incapable of shooting, from the defendant's person.

The defendant made an impassioned plea in his own behalf at his sentencing hearing.

The defendant was sentenced to imprisonment for his natural life without parole on the murder guilty finding and to a consecutive extended 60-year imprisonment term for the armed robbery.

## I

Prior to trial, the defendant filed a motion to quash his arrest and suppress evidence. An evidentiary hearing was held and the trial court denied the motion. Defendant in his *pro se* brief before this court contends that the trial court erred in so ruling. He urges that his arresting officer lacked probable cause to arrest him. We disagree.

At the hearing of the defendant's suppression motion the defendant called Chicago police officer Everett Johnson as a witness. Johnson testified that during the early morning hours of January 5, 1983, he saw defendant driving a vehicle with a broken taillight. When Johnson attempted to curb defendant for this traffic violation, defendant suddenly accelerated the speed of his car and a high speed chase ensued which resulted in defendant's colliding into a parked car several blocks away. Johnson testified that he then stopped his vehicle, exited, and asked defendant to produce a driver's license, which defendant was unable to do. Officer Johnson then placed defendant under arrest.

■■ ■ It is our view that the evidence supports the finding that the stop of the defendant and his subsequent arrest were legal. When an officer has reason to believe an ordinance has been violated, a resulting stop is based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Ramsey* (1979), 77 Ill. App. 3d 294, 395 N.E.2d 973.

In the case at bar, Johnson, having observed defendant driving with a broken taillight, was justified in his belief that an ordinance was violated. Section 12—201(b) of the Motor Vehicle Code provided,

"Every motor vehicle, trailer or semi-trailer shall also exhibit at least 2 lighted lamps, commonly known as tail lamps, which shall be mounted on the left rear and right rear of the vehicle so as to throw a red light ***." (Ill. Rev. Stat. 1985, ch. 95½, par. 12—201(b).) Johnson testified that defendant's broken taillight was emitting a white light and not a red light in accordance with the statute. When Officer Johnson attempted to curb the defendant for the violation, defendant accelerated. A chase ensued. Defendant was speeding, which was another traffic violation. The chase resulted with defendant's colliding into a parked car. Furthermore, when defendant was asked to produce a driver's license, he was unable to do so, which too was yet another traffic violation. The car that the defendant was driving was the 1979 Ford Grenada, which the defendant had taken from Ms. Annie Taylor at gunpoint only a few hours previously.

We are of the opinion that Officer Johnson was presented with articulable facts which certainly justified him in chasing and arresting the defendant. The trial judge therefore did not err in overruling the defendant's motion to quash his arrest and suppress the evidence.

## II

In his *pro se* brief, defendant further asserts that he was denied his constitutional right to the effective assistance of counsel.

We are of the opinion that defendant has failed to demonstrate that his counsel's performance and assistance were ineffective or incompetent.

To succeed on a sixth amendment claim of ineffective assistance of counsel, defendant must show that there is a "reasonable probability," which is a probability sufficient to undermine confidence in the outcome, that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) An error by counsel, even if professionally unreasonable, does not warrant setting aside a judgment in a criminal proceeding if the error had no effect on the judgment. (*Strickland v. Washington* (1984), 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) In the instant case there is no "reasonable probability" that had defendant's counsel resorted to the trial tactics to which defendant now suggests his counsel should have resorted the proceeding would have been different.

The evidence established that defendant committed the robbery-murder in complicity with Phillip and Johnny Nicks. The evidence of the defendant's guilt was tremendously overwhelming. By reason thereof and based on the testimony of the eyewitness, the victim's

mother, the testimony of the police officers and the assistant State's Attorney, the defendant's admission of his participation in the offenses and the evidence as a whole, we are firmly and unalterably convinced that the defendant's counsel staunchly advocated the defendant's cause and that he loyally and with unflagging fidelity represented the defendant, as he was required to do by the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution. Defendant's contention to the contrary does not merit further discussion.

### III

■ Defendant contends that he was denied a fair trial due to unwarranted and improper prejudicial prosecutorial comments made during the trial. Prior to the sentencing hearing, the defendant orally moved for a new trial based on the prosecutor's alleged improper prejudicial comments. Further, defense counsel objected during trial to the prosecutor's alleged prejudicial comments. Therefore we find that the defendant properly preserved the issue for our review.

The comments made during opening statement were objected to by defense counsel and the objection was sustained by the trial court:

"[Assistant State's Attorney]: Ladies and gentlemen, you will soon hear the evidence in this case. It's very tragic, a very sad event. You will hear about the last moments in the life of Kelvin Coleman. Good young man in his early 20's.

[Defense Counsel]: Objection.

THE COURT: Mr. State's Attorney, I'll sustain the objection."

■ The prosecutor's emotional appeal during his opening statement, although perhaps factually accurate, would have been best unsaid and the learned trial judge correctly and promptly sustained defense counsel's objection to it. The assignment of this comment by the prosecutor as error is unjustified. *People v. Lewis* (1976), 38 Ill. App. 3d 995, 998, 349 N.E.2d 528.

The defendant complains of alleged prosecutorial improper comments during closing argument:

"[Assistant State's Attorney]: *** One might ask what did Kelvin Coleman do which brought about his robbery and eventual shooting that night to warrant such an act. In fact, ladies and gentlemen, unless it could be said that the fact that he was a deaf mute that fact—

[Defense Counsel]: Objection.

THE COURT: Overruled.

\* \* \*

[Assistant State's Attorney]: \* \* \* We know as is her custom to make sure Kelvin, since he was a deaf mute, had the wallet on him.

[Defense Counsel]: Objection.

THE COURT: I'll overrule the objection. Proceed."

The following comment was made during closing argument, to which no objection was made by defense counsel:

"[Assistant State's Attorney]: We know in his wallet he carried identification. He was a deaf mute boy."

The final comments at issue were made during rebuttal closing arguments and were objected to by defense counsel and the objections were overruled:

"[Assistant State's Attorney]: \* \* \* They want you to believe that 11 months ago they knew how certain key people are dressed. This is all part of the conspiracy. See, those two sisters—

[Defense Counsel]: Objection.

THE COURT: Overruled.

[Assistant State's Attorney]: \* \* \* are part of this conspiracy to get their brother out of this.

[Defense Counsel]: Object, Judge, to the characterization.

THE COURT: Overruled. Confine yourself to the evidence.

[Assistant State's Attorney]: \* \* \* Unfortunately the conspiracy brings down breaks down when you ask them about other people that are around that same day. The conspiracy breaks down when you ask about different dates.

[Defense Counsel]: Objection.

THE COURT: Overruled."

■ In this State every defendant is entitled to a trial that is free from improper prejudicial comments or arguments by the prosecutor. In determining whether a prosecutor's comments or arguments constitute prejudicial error reference must sometimes be made to the content of the language used, its relation to the evidence and the effect of such argument on the rights of the accused to a fair and impartial trial. *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68; *People v. Mitchell* (1975), 35 Ill. App. 3d 151, 341 N.E.2d 153.

■ In the first instance, the prosecutor during opening statements commented that the victim was a "good young man." The prosecutor during closing arguments commented several times that the victim "was a deaf mute." The defense counsel's objection to this

statement of fact was overruled. Defendant criticizes the prosecutor's reference to the fact that the victim was hearing-impaired. A review of the record establishes that the comment was based on the evidence and was therefore proper.

■ In his closing argument, a prosecutor may not make statements solely to inflame the passion or to arouse the prejudices of the jury; he may not accuse defense counsel of fabricating a defense, of attempting to free his client by trickery, or of encouraging defendant to testify accordingly, or suggest that the defendant was well coached; a prosecutor should not make comments which are not based on the evidence and issues of trial; he must not make comments which make it appear to the jury that defendant was trying to keep unfavorable evidence from them, or persistently ask questions or make comments after an objection has been sustained. *People v. Witted* (1979), 79 Ill. App. 3d 156, 165-66, 398 N.E.2d 68.

In the case at bar, the victim's mother, Ms. Coleman, testified that because the victim was hearing-impaired she made a habit of checking his wallet. Ms. Coleman further testified that when she kneeled over her son after he was shot, he did not have his hearing aid. The prosecutors in their closing argument referred to the victim as a "deaf mute." Because both parties have a right to comment on the evidence and to draw any legitimate inferences therefrom in their closing argument, even if the inferences may be to the detriment of a defendant, we find the comment in the instant case was proper. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847; *People v. Bunting* (1982), 104 Ill. App. 3d 291, 432 N.E.2d 950.) Despite the detriment the comment may have been to the defendant, the comment was clearly based on evidence and was therefore proper.

Finally, we consider the prosecutor's comments during rebuttal closing argument that the defense witnesses were part of a conspiracy.

Defendant's sister, Margaret Bivens, testified on August 5, 1983, at trial, that on September 12, 1982, the day of the armed robbery and murder 11 months previously, she saw the defendant and the defendant was then wearing a bluish-gray T-shirt with blue lines on the sleeves, blue jeans, Allstar gym shoes and he wore a curly hairstyle. Ms. Bivens also testified that she had never seen the defendant with a mustache or sideburns.

Charlotte White, also defendant's sister, testified that 11 months previously, on September 12, 1982, the date of the robbery-murder, she too saw the defendant and that the defendant was then wearing a blue and gray sweat shirt with a T-shirt underneath it, blue jeans and

gym shoes. Ms. White further testified that on September 12, 1982, defendant did not have a mustache; however, prior to that date defendant did wear a mustache. Ms. White also testified that prior to September 12, 1982, defendant's sideburns were smaller.

Defendant now contends that he was prejudiced by the prosecutor's comments made during rebuttal closing arguments that these defense witnesses were part of a conspiracy. The prosecutor's comments were not based on evidence and improperly suggested that the witnesses were attempting to obtain an acquittal of the defendant by trickery and accordingly the witnesses were well coached. This argument was grossly improper and highly objectionable. Although it is obviously permissible for a prosecutor to comment upon the credibility of the witnesses during closing arguments (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847; *People v. Ross* (1978), 60 Ill. App. 3d 857, 377 N.E.2d 230), it is impermissible for a prosecutor to characterize the defense witnesses' testimony as some diabolical conspiracy, in the total absence of any evidentiary support for such argument. Prosecutors should meticulously refrain from attempting to overpersuade a jury by improper inflammatory argument. When they do so, they endanger the legal integrity of a jury's guilty finding and thereby deny the people they represent and the defendant the justice to which they are entitled. Prosecutors should desist in engaging in superfluous grandiloquence to infelicitously convince a jury of the rightness of the People's case. Such arguments serve only to jeopardize the People's case and bring it to the brink of illegal disaster and sometimes beyond.

From a review of the entire record in the case at bar, by reason of the overwhelming evidence of the defendant's guilt, the defendant's failure to object to some of the improper comments, and the instances when the trial court sustained the defense counsel's objections to the improper arguments, we are unwilling to say that the prosecutor's comments of which complaint is made and to which the defendant's objections were overruled deprived the defendant of a fair trial or were a factor in his conviction. Furthermore, the character and scope of argument to the jury is left very largely to the discretion of the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.) The trial judge is in a better position to observe the atmosphere of the trial and to determine the prejudicial effect, if any, of a remark made during argument. Absent a clear abuse of discretion we will not disturb his ruling.

## IV

The defendant further contends that his natural-life sentence for the murder was an abuse of the trial court's discretion.

Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)), grants the reviewing courts the power to reduce or modify a sentence imposed by the trial court. Alternatively, this court may vacate a sentence and remand the cause to the trial court for further hearing and imposition of sentence imposed by the trial court. A reviewing court may intervene upon a showing that the trial court abused the sentencing discretion entrusted to it. (*People v. Willingham* (1982), 89 Ill. 2d 352, 364, 432 N.E.2d 861; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Recognizing the fact that the trial court is normally in a better position to determine the punishment to be imposed, we are reluctant to disturb a sentence on review (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Williams* (1978), 62 Ill. App. 3d 966, 379 N.E.2d 1268), or substitute our judgment for that of the trial court, in the absence of an abuse of discretion by the trial court.

In the case at bar, the trial judge was faced with the burdensome task of sentencing a 19-year-old defendant for his commission of the serious offenses of murder and armed robbery. Although the defendant characterizes his life sentence for the murder as an abuse of the trial court's discretion, a review of the record and the evidence and an analysis and application of the sentencing statutes present the question of whether the trial court was empowered to impose a life sentence for the murder on the facts in this case.

In *People v. Bivens* (1987), 156 Ill. App. 3d 222, the defendant argued that the imposition of the maximum extended-term sentence for escape, possession of a stolen vehicle and armed robbery under section 5—5—3.2(b)(1) of the Uniform Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(1)), was an abuse of the trial court's discretion. This court pointed out that, "We need not, however, engage in a lengthy discussion regarding the legal positions taken by the parties as to the interpretation of the language *** in section 5—5—3.2(b)(1) *** since our examination of the record discloses that the premise upon which the arguments are based is factually incorrect." (156 Ill. App. 3d at 232-33.) Likewise, in the case at bar, our examination of the record discloses that the premise upon which the trial court imposed the life sentence was legally and factually incorrect.

A sentence of life imprisonment could have been imposed only upon that person who actually killed Kelvin Coleman. On this record it cannot be determined that the jury by its guilty verdict found that the defendant, Aryules Bivens, was that person. For these and

the reasons hereafter stated we conclude that the trial court lacked authority to impose a life sentence upon Bivens for the Coleman murder.

In the several counts of the instant indictment, No. 83—400, returned January 13, 1983, the defendant, Aryules Bivens, was charged with the September 12, 1982, armed robbery and murder of Kelvin Coleman. In an information, No. 82—8884, filed September 29, 1982, Johnny Nicks was also charged with the September 12, 1982, armed robbery and murder of Kelvin Coleman. The prosecuting attorney presented to the trial court the State's motion to consolidate the Bivens indictment and the Nicks information for trial on the ground that "[e]ach matter [arose] out of the same transaction." On February 17, 1983, the trial court granted the State's consolidation motion and the two causes and defendants were consolidated for a single, joint trial.

Subsequently, on June 15, 1983, Bivens' attorney filed a petition for a severance of Bivens' trial from the trial of the codefendant, Johnny Nicks. Bivens' severance motion asserted that "the co-defendant, Johnny Nicks, has made written and/or oral statements implicating [Bivens]." Bivens' severance motion additionally asserted that the defendants' defenses were conflicting and antagonistic. On the presentation of Bivens' severance motion and argument in support thereof, Bivens' attorney stated to the trial court that Bivens and Johnny Nicks

> "both made statements, Judge. They were originally oral statements made and then written statements made accompanied by a State's Attorney. The statement went into the incident and circumstances surrounding the murder of or loss of life of a Mr. Coleman in this matter. And there are certain admissions regarding personal culpability by each individual defendant individually as well as specific association that they did not—are not the ones that was [sic] the actual shooter. The reasons why we feel that we're entitled to a severance in this case is essentially that because Mr. Nicks' statement, as well as our client's statement, for that matter, specifically states is a case that is supposed to be where there is already the possibility, accountability of armed robbery kind of situation, where they specifically state that the other person was the person who actually committed the shooting and they say not them, even though they admitted to being in the same incident together *** ."

The trial court inquired of Bivens' attorney if Bivens stated that Nicks was the killer and if Nicks stated that Bivens was the killer. To these inquiries Bivens' attorney affirmatively responded.

In opposition to Bivens' severance motion, the prosecuting attor-

ney stated to the trial court:

> "Nicks gives a statement in which he gives an accountability statement. He is present. He's involved in the planning and commission of the armed robbery but the person who pulled the trigger was Bivens. Bivens interposes himself with Nicks where Bivens involves true accountability but the person that pulled the trigger in Bivens' statement is Nicks. \*\*\* We have strong accountability against the two individuals Nicks and Bivens. The only difference is Bivens says Nicks pulled the trigger and Nicks says Bivens pulled the trigger \*\*\*."

In furtherance of Bivens' severance motion his attorney additionally stated to the trial court that the prosecutor's trial theory was

> "[a]*ccountability of felony murder. This is a capital case* \*\*\* *the issue may eventually come before the court or before a jury to ask as to who actually is the criminal agent involved in the death of the decedent.* \*\*\* *the sentencing aggravation and mitigation statute makes a different point in stating that the person who was not the shooter cannot receive the death penalty.*" (Emphasis added.)

The trial court agreed with defense counsel's aforesaid contentions, stating, "I won't argue that with you." Nevertheless, the trial court denied Bivens' severance motion.

Aryules Bivens and Johnny Nicks, however, were not jointly tried. The record on appeal before us reflects that Johnny Nicks pled guilty, but to which offense and the penalty imposed are not disclosed in the Bivens' record on appeal. Judicial notice, which we take of the records of the circuit court of Cook County, criminal division, in Johnny Nicks' case, No. 82—8884, reflects that on August 2, 1983, Johnny Nicks was sentenced on his pleas of guilty to the armed robbery and murder to concurrent terms of 24 years' imprisonment.

At Bivens' trial, which commenced on August 2, 1983, the prosecutor proceeded under and pursued the theories that Bivens either shot Kelvin Coleman or was accountable for Johnny Nicks' shooting him.

Accountability for the conduct of another is provided in sections 5—1, 5—2(c) and 5—3 (Ill. Rev. Stat. 1985, ch. 38, pars. 5—1, 5—2(c), 5—3), which state:

> "5—1. A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5—2, or both.
>
> 5—2. A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. * * *

5—3. A person who is legally accountable for the conduct of another which is an element of an offense may be convicted upon proof that the offense was committed and that he was so accountable * * *."

At Bivens' trial, the prosecutor elected to take two bites at the apple to prove Bivens' guilt. The bites were inconsistent. The prosecutor presented evidence to the jury that Bivens did not shoot Coleman and evidence that Bivens was accountable for Johnny Nicks' shooting him. On the other hand, the prosecutor also presented contrary evidence to the jury that Bivens was the person who actually shot and killed Coleman.

At trial the prosecutor presented to the jury the testimony of Ms. Clara Coleman, mother of the deceased. She testified that she witnessed the shooting of her son and she identified the defendant Aryules Bivens as the person that she saw shoot him. The prosecutor also presented to the jury the testimony of Officer Michael Pochordo that Bivens confessed to him the robbery and shooting of Kelvin Coleman. Pochordo testified that Bivens told him that on the morning of January 5, 1983, he, Bivens, Johnny Nicks and Phillip Nicks were walking east on Bowen Street toward Cottage Grove Avenue when Phillip Nicks pointed out Coleman to rob, and Johnny Nicks followed Coleman into the building where Johnny Nicks robbed and shot the deceased. Johnny Nicks came down the stairs, and, upon Bivens' reminding Johnny Nicks not to leave a witness, Johnny Nicks went back upstairs. Bivens heard several shots and a woman scream; Johnny Nicks came back down the stairs with the gun and a CTA pass; and the three of them fled. Officer Pochordo further testified that he was present when Bivens gave a stenographically-recorded statement to Assistant State's Attorney Dean Morask.

Assistant State's Attorney Dean Morask testified that Bivens made a stenographically-recorded written and signed statement to him, People's exhibit No. 35, which was received in evidence and read to the jury. In this written statement Bivens stated that Johnny Nicks robbed and shot the deceased on the second floor of the building while he, Bivens, and Phillip Nicks stood by on the first floor; that after Johnny Nicks ran down from the second floor, Bivens reminded him about leaving witnesses and Johnny Nicks went back up the stairs;

that Bivens heard several gunshots and a woman scream; Johnny Nicks ran down the stairs; and as they fled the scene they discarded the robbery loot and gun. Bivens' written signed statement to Assistant State's Attorney Morask was the same as his oral statement to Officer Pochordo, but was more detailed.

Thus, the State's evidence of Ms. Clara Coleman's testimony presented to the jury was that the defendant, Aryules Bivens, robbed, shot and actually killed the deceased, Kelvin Coleman. Concomitantly, the State's evidence of Officer Pochordo and Assistant State's Attorney Morask's testimony of the defendant's confessions was that Bivens was not the actual killer of the deceased Coleman, but rather Johnny Nicks was the actual killer. The prosecutor chose to present this double-barreled evidence of Bivens' involvement as principal and Bivens' involvement by accountability to establish Bivens' guilt of the murder of Kelvin Coleman, which by law he was authorized to do.

In closing argument to the jury the prosecutors relied on the double-barreled evidence of Bivens' guilt in urging the jury to find him guilty of the robbery-murder. On one hand, the prosecutors urged the jury to find Bivens guilty on the testimony of Ms. Coleman, who identified Bivens as the person she saw actually shoot her son. On the other hand, the prosecutor in his closing argument to the jury urged:

"Well let's just say that Clara Coleman was not an eyewitness to this case. Let's say that there's no eyewitness to the case. The defendant is still guilty of the crimes of murder and armed robbery. This guilt is based upon this signed statement that you will have in the jury room. It's guilty of murder and armed robbery based upon this statement alone. *** There is enough in the statement to show this guy the defendant was an active participant in the commission of those crimes of armed robbery and murder. *** He was aiding, abetting in the commission of those crimes and this is what the statement shows ***. You'll also have an opportunity to go through the statement."

The prosecuting attorney further argued in his final closing argument to the jury that it should find the defendant Bivens guilty of the armed robbery and murder on the theory of legal responsibility. The prosecutor then argued:

"Ladies and gentlemen, I keep telling you the judge will instruct you on the law. It's your duty to follow the law. As a matter of fact it's so important to follow the law that you'll be given copies of the law to take back with you to the jury room and you'll be given an opportunity to read the law, go over the law.

* * *

One of the instructions you will have is the law on legal responsibility. This is the law that deals with partners in crime. The defendant is guilty of murder and armed robbery on his statement alone, based upon legal responsibility.

* * *

So for two reasons if you didn't have Clara Coleman which of course we have, the statement would convict the defendant of murder and armed robbery because of legal responsibility * * *."

The State tendered to the court an instruction on legal responsibility which the court gave to the jury and which instruction read as follows:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

On the issues instruction of murder, the trial court also gave the jury the State's tendered instruction which provided in pertinent part that to prove that the defendant was guilty of the Kelvin Coleman murder the State was required to prove beyond a reasonable doubt "that the defendant, *or one for whose conduct he is legally responsible,* performed the acts which caused the death of Kelvin Coleman" and "that when the defendant, *or one for whose conduct he is legally responsible,* did so he intended to kill or do great bodily harm to Kelvin Coleman * * *." (Emphasis added.)

The trial court also gave the jury the State's tendered instruction on legal responsibility on the armed robbery charge. This instruction stated in pertinent part that to sustain the charge of armed robbery the State must prove beyond a reasonable doubt "1st: that the defendant, *or one for whose conduct he is legally responsible,* took a bus pass * * * from Kelvin Coleman; and 2nd: that the defendant, *or one for whose conduct he is legally responsible,* did so by the use of force * * *, 3rd: that the defendant, *or one for whose conduct he is legally responsible,* carried on or about his person a dangerous weapon * * *." (Emphasis added.)

The trial court submitted to the jury general verdict forms. The jury returned the verdicts, "We, the jury, find the defendant Aryules Bivens guilty of the offense of murder," and "We, the jury, find the defendant Aryules Bivens guilty of the offense of armed robbery." From (1) these general guilty verdicts; (2) the evidence upon which the

verdicts are predicated; (3) the prosecutor's argument which urged their return; and (4) the court's instructions to the jury which legally guided the jury and on which the verdicts are also based, it is impossible to determine whether the jury found that the defendant Aryules Bivens was the person who actually shot and killed Kelvin Coleman, or that Bivens did not shoot Coleman, or whether the jury decided that Johnny Nicks shot him, and the defendant Bivens was accountable and legally responsible for Nicks' doing so and that Bivens was therefore guilty of murder.

At the sentencing hearing the defendant recognized this disparity when he stated that he was not the person who shot and killed Coleman. He urged the trial court to consider that he was not the person who killed Coleman in the court's determination of the sentence it would impose.[1]

The prosecutor at the sentencing hearing expressly sought imposition of the death penalty upon the defendant, Aryules Bivens, "under

---

[1]At the sentencing hearing the defendant stated to the trial court, "During the trial and whatever, it was one Phillip Nix [sic], he was brought up in the trial and that he was taken to the police station for questioning, well, the State had him on the witness list and *** he wasn't called to the stand to testify, although he was with the police or told the police or whatever, where the weapon and other items of the victim was at. He was not called to the stand to give his testimony, nor was he arrested or indicted, or whatever, for this same incident that me and his brother, although he was with us that night.

\* \* \*

Well, I just feel that justice should be given to Mrs. Coleman for her son's death, although I'm not admitting—I'm not saying that I was the one who caused her son's death, I would take the responsibility for being there on the scene—you know—and maybe if I were to just have done something or said something to the other co-defendant in this case, maybe it wouldn't had took place.

I—I feel that justice should come and I'm willing to accept this justice as far as Mrs. Coleman receiving justice for her son's death.

\* \* \*

I know, she'd been led to believe—which I know for a fact she didn't see me, I think, at the time or the next morning or however, when Phillip Nix [sic] was taken to the police station and Johnny Nix [sic] came into the police station, that day—you know—had in some way, form or fashion that they, without a doubt, they throwed all the weight off on me—you know—and by me being in—you know—in a murder case before, and being that it was the same polices who arrested me on the last case was in on this case, I feel that they had the two brothers to cook up a story, cook up a story and say that I was the one, I was the shooter, and one was there but he didn't do nothing but—you know— and the other one was outside of the building and he didn't do nothing and therefore that leads the police to get my photograph out of the—and take Johnny Nix's [sic] photograph as well, and take it to Mrs. Coleman—you know—and I believe that at that time they gave her some sort of hint, or whatever, which photograph to pick out because I know for a fact—you know—I did not shoot him."

the provisions of ch. 38, sec. 9—1, subsec. (b), subsec. 6'' (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)).[2] The trial court declined to impose the death penalty. Instead, it imposed a sentence of imprisonment for the defendant's natural life, but under the facts in this case and the law applicable thereto, the trial court was powerless to do so.

It is provided in sections 9—1(b)(6)(a)(i) and 9—1(c) (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(6)(a)(i), (c)) as follows:

> "(b) A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:
>
> * * *
>
> (6) the murdered individual was killed in the course of another felony if:
>
> (a) the murdered individual:
>
> (i) *was actually killed by the defendant,* * * *
>
> * * *
>
> (c) [and] the other felony was one of the following: armed robbery * * *." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(6)(a)(i), (c).

It is clear from the foregoing statutory language that to qualify for imposition of the death penalty for the commission of a felony murder arising out of an armed robbery, it is required that "the murdered individual was actually killed by the defendant." It is provided in subsection (f) of section 9—1 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(f)), that "the burden of proof of establishing the existence of any of the factors set forth in subsection (b) is on the State and shall not be satisfied unless established beyond a reasonable doubt."

From the totality of the facts and circumstances, the State's conflicting evidence presented to the jury, the prosecutor's inconsistent arguments to the jury, the court's instructions to the jury, and the jury's general guilty verdicts in the case at bar, it cannot be determined that the jury by its guilty verdict found that the murdered individual, Kel-

---

[2]At the sentencing hearing the prosecutor stated to the trial court:

"Your Honor, first of all, in regard to the qualification for the capital punishment penalty under the provisions of Chapter 38, Section 9—1, Subsection B, Subsection 6, we have shown that the defendant qualifies.

The Defendant was 19 years of age at the time of the offense. We have shown through the testimony of Clara Coleman that the person that pulled the trigger and shot and killed Calvin Coleman [*sic*] was the Defendant Aryules Bivens.

We have shown through the statement made by the Defendant to Assistant State's Attorney D. Morask, that the motive for this murder was armed robbery.

So, under Chapter 38, Section 9—1, Subsection B, Subsection 6, the Defendant qualifies for capital punishment."

vin Coleman, was actually killed by the defendant, Aryules Bivens. Therefore, and because the sentencing hearing was before the court and not before the jury, subsection (h) of section 9—1 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h)) applied. This section provides:

> "In a proceeding before the court alone, if the court finds that none of the factors found in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h).)

The factor set forth in subsection (b) of the statute which does not exist and is absent in the instant case is a jury's guilty verdict by the terms of which or based on facts from which it is conclusive that the jury found that the murdered individual was actually killed by the defendant. Therefore, said subsection (h) required that the court sentence the defendant under chapter V of the Unified Code of Corrections, which is section 5—1—1 *et seq.* (Ill. Rev. Stat. 1985, ch. 38, par. 1005—1—1 *et seq.*).

The sentence to be imposed for murder as set forth in section 5—8—1(a)(1) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)) is as follows:

> "(a) A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
>> (1) for murder, (a) a term shall be not less than 20 years and not more than 40 years, or (b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment, \*\*\* or the court shall sentence the defendant to a term of natural life imprisonment; \*\*\*." Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).

In the case at bar, the prosecutor did not contend and the trial court did not find that Kelvin Coleman's "murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" and thus the life imprisonment sentence was not imposed on that basis. As previously pointed out, the aggravating factor of subsection (b) of section 9—1, for imposition of the death penalty or life imprisonment, on which the trial court relied in imposing the life imprisonment sentence was not present, *i.e.*, that Kelvin Coleman, "the murdered individual was actually killed by the defendant," Aryules Bivens. The

trial court therefore lacked authority to impose the life imprisonment sentence upon the defendant.

It is further noteworthy that the prosecutor in the case at bar did not seek imposition of an extended term of imprisonment of "not less than 40 years and not more than 80 years" on the guilty murder verdict under the aggravating factors for imposition of an extended term of imprisonment under sections 5—8—2 and 5—5—3.2 (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—2, 1005—5—3.2).

■■ From a review of the record before us it cannot be discerned whether the jury by its guilty murder verdict found the defendant, Aryules Bivens, guilty as principal, *i.e.*, that he was the person who actually killed the deceased, Kelvin Coleman, or whether the jury found Bivens guilty under accountability for his aiding, abetting and agreeing to the commission of Coleman's murder by Johnny Nicks. Having chosen to take two bites from the apple to prove Bivens' guilt as principal and as an accountable accomplice, the prosecutor was bound by that choice at sentencing. He was not also entitled to another two bites from sentencing. Because the prosecutor presented evidence of Bivens' guilt as principal as well as evidence of Bivens' accountability, because the prosecutor argued to the jury to find Bivens guilty on either or both theories and because the jury was so instructed, the guilty verdict fails to specify and it cannot be determined whether the jury found Bivens guilty as the actual shooter or as one who was accountable for the shooting of Coleman, the defendant's life imprisonment sentence is invalid and it is therefore vacated. Rather than determine and impose a proper sentence, which we are authorized to do, we choose to remand the cause to the trial court for a sentencing hearing and the imposition of an appropriate sentence.

## V

■■ Lastly, the defendant argues that the trial court improperly imposed a consecutive sentence of an extended term of 60 years' imprisonment for the armed robbery conviction. We agree.

Section 5—8—4(b) of the Unified Code of Corrections provides:

> "The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).

In imposing the consecutive sentence of an extended term of 60 years' imprisonment on the armed robbery guilty verdict, the trial court did not set forth an appropriate basis therefor in the record. The trial court simply stated:

> "On the armed robbery conviction, of course, this Defendant qualifies for the extended term on that. I don't know what it means when I have already sentenced him to natural life, but on the armed robbery charge I will sentence under the extended term of 60 years in the Illinois Department of Corrections. I don't know what it would mean to say that they were to be served concurrently or consecutively, because unless the law is changed in some way, he will not be paroled anyway.
>
> But, for whatever it means, I order the armed robbery sentence to be served consecutively to the sentence on the murder count."

For the above reasons we vacate the consecutive imprisonment sentence on the armed robbery guilty verdict.

██ The defendant was sentenced to an extended term of 60 years' imprisonment on the armed robbery verdict. Although the trial court stated, "On the armed robbery conviction, of course, this defendant qualifies for the extended term on that," the court neglected to specify on what basis the defendant qualified for imposition of an extended term of imprisonment. The trial court pointed out, "Other factors in aggravation, of course, would be—I am not sure this is applicable here—that would be that if the person who was injured or killed was physically handicapped at the time of the offense. The person was physically handicapped, but I am not sure the defendant knew that so I don't think that would be applicable here."

The trial court stated in imposing the extended term of 60 years' imprisonment on the armed robbery verdict:

> "If the court finds that the aggravating factors listed in subsection B of section 9—1 [Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)] are present, the court has certain avenues that it can pursue. Those factors certainly fit the bill here. The statute says if the murdered individual was killed in the course of another felony, that is essentially what happened here ***."

As previously pointed out, none of the aggravating factors of subsection b of section 9—1 of chapter 38 were present in the case at bar. Moreover, the aggravating factors of subsection b of section 9—1 are for the imposition of the death penalty or life imprisonment only for capital offenses, which do not include armed robbery. The trial court did not resort to, rely on or find the existence of any of the aggravat-

ing factors for imposition of an extended term of imprisonment enumerated in section 5—5—3.2(b) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)).

The defendant was sentenced on the murder verdict to life imprisonment. Thus, section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2) applied to the armed robbery sentence. This section provides:

> "Extended Term. (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present."

As stated, the trial court did not find that any of the extended-term factors in aggravation, set forth in subsection (b) of section 5—5—3.2 were present. This court stated in *People v. Bivens* (1987), 156 Ill. App. 3d 222, 234:

> "It has been settled by our supreme court in *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, reaffirming its decision in *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, that under the plain language of section 5—8—2(a) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)), where a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class. *** [W]e find that the trial court's improper imposition of multiple extended-term sentences for both armed robbery and escape, *** necessitates remandment of the case for a new sentencing hearing."

We therefore vacate the 60-year extended-term imprisonment sentence on the armed robbery verdict.

The judgments of conviction for the murder and armed robbery are affirmed. The life imprisonment sentence on the murder finding and the 60-year extended-term consecutive imprisonment sentence on the armed robbery finding are vacated. The cause is remanded for a sentencing hearing and imposition of sentences thereon consistent with the views expressed herein.

Affirmed in part; sentences vacated and cause remanded for sentencing hearing and imposition of appropriate sentences.

LORENZ and MURRAY, JJ., concur.