THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PAULA MARIE SIMS, Defendant-Appellant.

Fifth District No. 5—90—0287

Opinion filed May 4, 1993.

MAAG, J., specially concurring.

Donald E. Groshong, of Williamson, Webster, Groshong, Moorman & Falb, of Alton, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendant was convicted by a jury of the offenses of murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)), obstructing justice (two counts) (Ill. Rev. Stat. 1989, ch. 38, par. 31—4(a)), and concealment of a homicidal death (Ill. Rev. Stat. 1989, ch. 38, par. 9—3.1(a)). She appeals her convictions and her sentence of natural life without parole for the murder conviction. We affirm.

Before discussing the facts and issues in this bizarre and highly publicized case, we must first dispose of defendant's motion to supplement the record with a book about the investigation and trial of this case authored by the trial prosecutor, Don W. Weber, and a newspaper reporter covering the trial for the St. Louis Post-Dispatch, Charles Bosworth. (D. Weber & C. Bosworth, Jr., Precious Victims (1991).) Alternatively, defendant requests this court to remand this cause to the trial court for a hearing so that the book can be made a part of the record on appeal. In reply to the State's objection to the motion, the defendant also urges this court to take "judicial notice" of the book.

Defendant alleges in her motion to supplement the record that the first publication and printing of the book occurred in October 1991, after the record on appeal and defendant's brief were filed in this court. In her post-trial motion, defendant raised the issue that the assistant State's Attorney (prosecutor) was writing a book about the trial. The prosecutor admitted at the hearing on the post-trial motion that he had thought about and discussed writing the book with Charles Bosworth, Jr., during the trial; that he and Bosworth agreed

972

to the project a week after the trial had ended; and that he signed a contract with the publisher to write the book a week before the sentencing hearing. The State's Attorney, William Haine, stated: "[I] was in on all discussions involving trial strategy, witnesses, arguments, argument to the court and to the jury. And at no time did a book come up."

Defendant claims that the book would show a conflict of interest by the trial prosecutor, prosecutorial misconduct, undisclosed discovery violations, and possible perjury by police witnesses. Defendant exhorts this court not to be "the only three people in the State who are forbidden to consider or know the contents of the book" and to do "poetic justice." Finally, defendant feels that "[i]t is ludicrous for the State to suggest that this Appellate Court should stick its head in the same [sic] like an ostrich."

■ Defendant claims that this "situation is entirely unique and no case law or other precedent in point is known to exist." The only authority cited by defendant for allowing the record to be supplemented by the book is Supreme Court Rule 329 (134 Ill. 2d R. 329). This rule states in pertinent part as follows:

"Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof. Any controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth." (134 Ill. 2d R. 329.)

In construing Rule 329, the supreme court said:

"Rule 329, as the Committee Comments demonstrate, is a very broad provision whose object is to allow the record on appeal to be amended to correct inaccuracies, supply omissions, correct improper authentication, and settle controversies as to whether the record on appeal accurately discloses what occurred at trial." (*People v. Chitwood* (1977), 67 Ill. 2d 443, 447, 367 N.E.2d 1331, 1333.)

Rule 329 is not to be "used as a vehicle for introducing additional evidence into the record." (*People v. Miller* (1989), 190 Ill. App. 3d 981, 989, 548 N.E.2d 1, 6.) Further, the supplementation must have a basis in the trial court record (*People v. France* (1987), 163 Ill. App. 3d 819, 516 N.E.2d 1036) and cannot be used to impeach or contradict the contents thereof. (*People v. Miller* (1989), 190 Ill. App. 3d 981, 548 N.E.2d 1.) Here, the supplementation of the record with the book

would introduce new evidence into the record, some of which, if the defendant's claims are accurate, would impeach and contradict matters of record.

The closest precedent that this court could find is *People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422. In *Sheridan*, defendant attempted to supplement the record on appeal with the separate record of the defendant's accomplice who testified against defendant, to show that a deal had been made by the State and the accomplice for the accomplice's testimony. The court pointed out that this was not a proper supplementation of the record as contemplated by Rule 329. It was, instead, an attempt to introduce evidence not contained in the trial record, and the defendant was not permitted to supplement the record with this material. The same reasoning is applicable here.

In addition, this court cannot consider the contents of the book under the doctrine of "judicial notice." A court may take judicial notice of "that which everyone knows to be true." (*People v. Snulligan* (1990), 204 Ill. App. 3d 110, 561 N.E.2d 1125.) However, we are not ready to accept everything that the prosecutor says or writes as being outside the area of controversy or so capable of being verified as to be beyond reasonable dispute. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §201 *et seq.* (5th ed. 1990).

This court cannot amend Supreme Court Rule 329 or stretch the doctrine of "judicial notice" beyond recognition simply because we have a "unique opportunity" or because this case may have received more publicity than the average case. It is often forgotten that the State is also entitled to fair treatment and justice, and that the State must be given the opportunity to rebut and defend against the serious charges leveled by defendant. We appreciate defendant's concern for judicial economy by settling all issues now rather than in future proceedings, but we are not so concerned with judicial economy that we totally ignore all the laws, rules, and procedures developed to protect all the parties involved in the litigation.

Furthermore, there is nothing in the record to assure the accuracy and veracity of the statements made in the book. Those matters and the weight they are to be given have to be determined in proper proceedings provided by law. This court has neither the authority nor the means of making such determination, nor can this court remand this case to the trial court for a hearing when no pleadings have been filed defining the issues to be raised.

The defendant's motion to supplement the record falls outside the ambit of Rule 329, and the book is not admissible under the doctrine

of judicial notice. Therefore, defendant's motion to supplement the record is denied.

■■ Even though the contents of the book cannot be considered in this case, we still must resolve the issue as to whether the fact that the prosecutor thought about writing a book about the trial he was prosecuting and any discussion he had regarding those thoughts during the trial constitute a *per se* violation of defendant's right to a fair trial. We do not think that thoughts that may cross a prosecutor's mind or discussions about such thoughts, without some showing that the defendant suffered harm, are sufficient to grant a new trial. Simply because a prosecutor, judge, or defense attorney may consider profiting from his or her involvement in a highly publicized trial does not necessarily mean that the prosecutor, judge, or defense attorney has engaged in conduct that violates the Code of Professional Responsibility. (134 Ill. 2d R. 1.1 *et seq.*) In addition, State's Attorney Haine stated that he was involved in all phases of defendant's trial, and he was unaware of a book in the offing. We could not find anything in the record to indicate that the trial prosecutor or the State's Attorney conducted himself during the trial in a manner calculated to prejudice the defendant's right to a fair and impartial trial deriving from the prosecutor's contemplation of writing a book.

We now present the facts in this long trial. There were, in essence, two murder trials within this trial. Defendant was charged with the murder of her six-week-old daughter, Heather. The facts surrounding the death of Heather, in April 1989, were so similar to facts surrounding the death of defendant's infant daughter, Loralei, in June 1986, that the trial judge allowed the State to present the evidence surrounding the death of Loralei in order to show defendant's *modus operandi*, intent, knowledge, lack of accident or mistake, and her identity in the death of Heather. The State proceeded chronologically in its presentation of the evidence, with the facts surrounding Loralei's death being presented first and then the facts of the victim's death. Since defendant is only charged with the murder of Heather, we shall reverse the order of discussion and show the facts surrounding the death of Heather before regressing in time to Loralei's death.

Defendant's initial version of the events of April 29, 1989, which she related to the police, was that she was at home alone with her 14-month-old son, Randall, and her six-week-old daughter, Heather. Her husband, Robert, was at work. Heather was in a bassinet downstairs and Randall was asleep upstairs. At approximately 10:30 p.m. that evening, she was taking the garbage out, and when she reached the bottom of the porch stairs, she saw a person 10 feet away pointing a

gun at her. This person ordered her back into the house. Defendant remembered that as she stepped inside her kitchen door, she was hit on the back of the head and neck area with an unknown object, rendering her unconscious. Defendant did not regain consciousness until her husband awoke her at 11:20 p.m., about 45 minutes later.

Defendant's description of her assailant to the police was that he was a man of medium build and that he was as tall as the policeman interviewing her. She was unable to determine the intruder's race because he was wearing a dark ski mask, even though the mask had large circular eye holes. Defendant believed her assailant was a male by the sound of his voice, and she conjectured that he might be white.

Nine months later, when defendant testified at trial, she broke the news that the intruder of April 1989 was the same person who had broken into her home in 1986 and abducted her infant daughter Loralei. She knew that the assailant was the same person by his voice. She also stated that he was definitely a white male.

Defendant also altered her initial version of the event when she testified at trial that she was uncertain about the exact time that she was knocked unconscious. Detective Mick Dooley had testified, prior to defendant's testifying, that defendant told him on the night of Heather's alleged kidnapping that she was knocked out about 10:30 p.m. and that her husband awoke her at 11:15 p.m., 45 minutes later. The nurse who saw defendant at the hospital around 12:35 a.m. that same night corroborated Dooley's testimony when she testified that the defendant had also told her she was knocked out around 10:30 p.m. The testimony of Detectives Dooley and Rick McCain also established that, in their interview with the defendant at 3 a.m. the morning of April 30, she again reiterated that the incident occurred at approximately 10:30 p.m.

The testimony of Robert Sims, defendant's husband, established that, when he arrived home from work between 11:12 and 11:15 p.m., he found defendant lying facedown on the kitchen floor. He called her name several times, but she appeared lifeless. He thought she had had a heart attack. He shook her several times and received no response. Robert went to check on the children, but he could not find Heather. He returned to defendant and shook her until, finally, she started groaning. He asked her where Heather was, to which defendant responded, "[I]n there in the bassinet." She mumbled that when she took the garbage out, "some guy" walked up and told her to go back into the house, and then he hit her. Robert then ran down the hall and leaped up the stairs, with defendant right behind him. They found their son, Randall, asleep upstairs and unharmed. They came back

downstairs and searched the house for Heather three or four more times. Defendant finally said, "[W]e have to call the cops," and gave Robert the number she obtained from the side of the refrigerator.

Detective Dooley, an officer investigating Heather's disappearance, testified that, at about 12:30 a.m. in the morning after the incident, he took defendant to the hospital, although she appeared to be fine. Defendant did not want to go, but she finally relented and walked unaided from the house to the police car. On the way to the hospital, defendant mentioned a home invasion that had taken place down the street from her home and that her husband was afraid that this kind of thing would happen, apparently meaning a home invasion and kidnapping. Defendant's condition suddenly degenerated as they approached the hospital, she leaned forward moaning and rubbing the back of her neck. Dooley helped her out of the car and into the hospital, as he was afraid she might fall. He put her into a wheelchair once they were inside.

The nurse who examined defendant that evening testified that she did not see any lacerations, lumps, or bruises, but she did see some redness on the back of the neck where defendant had been rubbing. The nurse had never seen a person who was knocked out for a long time who was not confused and disoriented. Doctor Duk C. Kim, who also examined defendant that night, prescribed an ice bag and some Tylenol for defendant. Dr. Kim thought it "highly unlikely to impossible to correlate what she [the defendant] told me and then the findings [sic]." The doctor was going to discharge her when Detective Dooley insisted upon an X ray. The doctor agreed reluctantly. The X rays were negative. Detective Dooley then took defendant to the police station, where she was interviewed for an hour.

Dr. Mary Case, a forensic pathologist and neuropathologist, testified that a five-minute loss of consciousness is severe and a 45-minute loss of consciousness is "of quite serious concern." A person who has been knocked out for a period of time would be "woozy" and in a stupor, would recover gradually, and would not be alert 10 minutes after recovering consciousness. According to Dr. Case, that person would have retrograde amnesia and would not remember anything that occurred 5 or 10 minutes or more prior to the blow. It also would be impossible for anyone knocked out 30 to 45 minutes to remember the blow.

Dr. Case further testified that she had performed the autopsy on Heather. It was her opinion that Heather had died by suffocation caused most likely by placing a hand across her mouth. The doctor determined that Heather must have been frozen after she died, and that

her death must have occurred three or four days earlier, based upon the internal decomposition, the lack of external decomposition, and the bright red colors on the forehead, cheek, and neck, and from the loss of rigor mortis. It was also Dr. Case's opinion that Heather's death occurred near the time of her disappearance.

The testimony of other police officers established that trained tracking dogs were brought to the Sims home at 11:27 p.m. that evening, but the dogs did not pick up any scent of the intruder. The police investigation revealed that on the night of Heather's disappearance a neighbor across the street was walking two of her dogs around 10:40 to 10:45 p.m. and then returned to her home and took her other two dogs out. The neighbor did not see or hear anything unusual.

On May 3, 1989, four days later, Heather's naked body was found in a plastic trash bag in a trash barrel at a riverside park area in Missouri. This park area was just across the bridge from Alton, Illinois, approximately 2.7 miles, or a drive of less than six minutes, from defendant's home. Witnesses' testimony revealed that the trash bag was not in the trash barrel at 10:30 a.m., but that the bag was present in the trash barrel at 1 p.m.

The police and the Federal Bureau of Investigation (FBI), through forensic testing, traced the trash bag in which Heather's body was found to a roll of trash bags still in defendant's home. According to defendant's theory, the alleged kidnapper removed only Heather and a trash bag from her home and did not touch or disturb anything else. The supposition is that the intruder then smothered Heather, removed her clothes, put her into the trash bag obtained from defendant's home, stored her body in a freezer, and dumped her into a barrel in Missouri four days later.

Defendant's parents, who lived about a four- or five-minute drive from defendant's home, were away on a trip on the date of Heather's disappearance. Defendant's husband called them at approximately 2 a.m. on April 30, 1989, and they told Robert that they would come back that day. Defendant had a key to her parents' home and had known about their planned trip several days before their departure.

Robert's sister, Linda Condray, testified that she came over to defendant's home about 8 a.m. the morning of April 30, just before defendant left to go to her parents' home. An unexplained gap as to defendant's whereabouts was presented when defendant contradicted her sister-in-law's testimony. According to defendant's testimony, she left her home that morning before her sister-in-law arrived and went to her sister-in-law's home rather than her parents' home. Her sister-in-law's husband, who supposedly helped defendant unload the car,

was never called to verify defendant's story. Defendant's sister-in-law also testified that defendant and defendant's husband arrived at her house just before 3 p.m., and that they arrived separately. The police left defendant's home at approximately 11 a.m. on April 30.

Defendant's father testified that he first saw defendant, after arriving home from his trip, when he went to Linda Condray's home after 3:30 p.m. on April 30, 1989. Defendant's parents' freezer was almost empty, according to defendant's aunt, who opened it later that day to get some meat.

Defendant and her husband testified that they were home the morning and the afternoon of May 3, 1989, the day Heather's body was found, thus asserting they could not have driven to Missouri to deposit Heather's body in the trash barrel. Defendant's and Robert's testimony was not corroborated by any other witnesses, even though both claimed the press had been outside their home constantly since Heather's disappearance.

Stephanie Werner Cook, defendant's hospital roommate when Heather was born, testified that defendant told her that three years earlier a masked gunman had knocked her unconscious, while she was returning from taking the trash out, and that the gunman had taken her baby, Loralei. Defendant's daughter Loralei was abducted on June 17, 1986, but, at that time, defendant had told the police that the masked gunman came into her house and down into her basement, where defendant was watching television. He made defendant lie on the floor, did *not* hit her, took Loralei out of the bassinet by the basement stairs, and took off with defendant in pursuit, when she heard her door close. Cook related to her mother defendant's story of being knocked out while returning from emptying the trash, and when the news came out six weeks later that defendant's daughter had been abducted while defendant was taking out the trash and that a masked gunman had knocked defendant out, she contacted the police. Defendant denied that she told Cook details of Loralei's kidnapping and murder.

The evidence of Loralei's abduction, presented by the State, was that at approximately 10:20 p.m. on June 17, 1986, a masked gunman appeared on defendant's basement stairs. He wore a dark ski mask, a dark short-sleeve t-shirt, and dark pants. Defendant's dog, a collie, had not barked or given any warning, even though the screen door was locked, had a closer on it, and made a definite loud squeak when it closed. The gunman supposedly entered by this screen door, because a cut had been made in the screen. When the gunman left and defendant heard the squeak of the door, she jumped up and ran after the

gunman. Once outside, she saw a "shadowy figure" running down the driveway to the south, and she heard what she thought was someone running on gravel. She yelled and chased after him. The Grays, the neighbors who lived at the end of defendant's driveway, did not hear her, even though it was a hot summer evening and their windows were open. Mr. Gray was getting a glass of water in the kitchen at about the time of the alleged abduction, and he did not see or hear anything suspicious when he looked over at defendant's house. Defendant came to their door and requested help. In spite of Mrs. Gray's pleas to defendant to wait for the police to arrive, defendant insisted on returning to her house to call her husband, who was at work.

The police arrived and brought three trained tracking dogs. The dogs, in spite of their success record, did not pick up any strange scents around the driveway or the road. The next morning, the police brought other dogs to search, again without success.

On the morning of June 18, 1986, the police were to search east of defendant's home, and divers were going into a pond next to defendant's property. At that time, Lieutenant Wayne Watson of the Illinois State Police suggested to the defendant that this was a good time for the defendant to go with the police to give a statement, but defendant protested that she did not want to leave the house. According to Lieutenant Watson, defendant said: "[N]o, no, I want to be here when they bring her body up." She then stuttered and said: "[T]hat is not what I mean. I mean my baby is alive and I want to be here when they bring her on the porch."

Loralei's nude body was found on June 24, 1986, about 100 feet north of the rear of defendant's house near the top of a ravine in a heavily wooded area with dense underbrush. It appeared from the evidence that someone had thrown the body of Loralei off the top of the ravine after coming through defendant's backyard. The argument espoused by defendant, that the abductor returned to her home sometime after June 17, while the police were investigating Loralei's disappearance, and, in 100-degree weather, climbed a steep ravine in a woods thick with underbrush to place the child near the top of the ravine, belied logic and reason.

The police recreated the scene of the night Loralei was allegedly kidnapped by having a policewoman lie on the floor as defendant did and, upon hearing the screen door close, jump up and run outside. Another police officer closed the screen door, ran to the back of the house, acted as if he were disposing of Loralei's body down the ravine, and then ran down defendant's driveway. A videotape of the

several reenactments that covered all of the possible routes the kidnapper could have taken was made and shown to the jury at trial. These reenactments revealed that it was impossible for the kidnapper to have run north to the back of the house, dispose of the body of Loralei, and return south past the house and be 75 feet down the gravel driveway by the time defendant came up from the basement and saw and heard the "shadowy figure." The policewoman, playing the role of defendant, arrived at the driveway before or at the same time the policeman, acting as the intruder, ran past her. These enactments tracked closely the version of events related by the defendant to the police at the time of Loralei's disappearance.

No ransom demand was made, and nothing was disturbed in the house in both daughters' abductions. The killer removed the clothing of both infants. Defendant lived in two different locations at the times of the abductions, and she had an unlisted telephone number on both occasions, so her address was not readily available to the public. Her husband worked swing shifts both times so that it would have been difficult for anyone outside of the plant to know when he was going to be at work. Seven trained dogs with high success rates in tracking unknown persons were unable to detect the scent of the alleged intruder on the two occasions.

Defendant told a co-worker in 1983 that she did not want children: "[E]specially not a little girl. It's too much trouble." Defendant's roommate in the hospital when Loralei was born heard defendant crying and apologizing, while talking on the telephone to her husband, for having a baby girl. Defendant's husband admitted that defendant had apologized for having a girl, but defendant denied making such apology. Linda Heistand, a friend of defendant, testified defendant had stated that she feared Loralei would be kidnapped, before Loralei disappeared, which testimony was denied by defendant. Several nurses testified that defendant and Robert were not excited or interested in the birth of Heather. Another good friend of defendant, June Gibson, testified that three weeks after Heather's birth, defendant said she did not know how much longer she could "handle it," referring to the fact that she slept downstairs with Heather, while her husband and Randall slept upstairs. Defendant also denied this. Defendant's husband admitted on the witness stand that defendant moved back upstairs with him after Heather disappeared, and before her body was discovered, they had "good" sex. Defendant again denied this.

Following the trial, the jury found the defendant guilty of murder, of obstructing justice, and of concealing a homicidal death. The same

jury that convicted defendant determined that the defendant was eligible for the death penalty, but after the hearing on aggravation and mitigation, the jury found there were sufficient mitigating factors to not impose the death penalty. The court then imposed a natural-life sentence on defendant. The defendant appeals and raises numerous issues for consideration. Because of the nature of the issues raised by the defendant, we will not consider these issues in the order raised by the defendant, but we will consider them in the order that they were presented to the trial court.

## I. DEFENDANT DENIED FAIR TRIAL

Our first consideration in this appeal is defendant's contention that she was denied a fair trial by an impartial jury. Under this argument, defendant raises the following subissues: (1) that the court erred in denying defendant's motion to appoint and to pay for requested experts; (2) that the court and the prosecution did not ensure a trial free from publicity generated by defendant's case; and (3) that the court erred in denying defendant's challenges of prospective jurors for cause.

### A. MOTION FOR EXPERT WITNESSES

Defendant filed a pretrial motion requesting the appointment of several experts: a trace evidence examiner; a pollster to ascertain the extent and effect of adverse pretrial publicity in Peoria County; a medical consultant; a jury consultant; and a forensic pathologist. Defendant also sought payment of the experts from the State. The trial judge denied the motion. On appeal, defendant argues that because of questions as to the time and cause of death, because of the trash bag evidence, and because of the publicity generated, experts were essential to afford defendant an ability to confront the State's evidence and to assure a fair trial. We affirm the trial court's denial of the motion.

A similar motion was considered in *People v. Hebel* (1988), 174 Ill. App. 3d 1, 527 N.E.2d 1367. In *Hebel,* this court set forth what a defendant must do for the appointment and funding of expert witnesses: (1) a defendant must apprise the court of the need for expert witnesses and the relevancy of the expert's testimony; (2) a defendant must identify the expert whom he wishes to employ; (3) a defendant must give the court an estimate of the fees involved; and (4) a defendant must establish indigency. (*Hebel,* 174 Ill. App. 3d at 34, 527 N.E.2d at 1388-89.) These requirements preclude the grant of a blank check on the county treasury to a defendant who can afford to hire

his own experts, prevent the hiring of unneeded experts, prevent the hiring of experts whose opinions might not be relevant to any of the issues in the case, and prevent the hiring of so-called experts who really might not be experts.

■ Defendant failed to meet the requirements set out in *Hebel*. Defendant never apprised the trial court who the experts were that she wished to employ, the relevance of their testimony, the necessity of the experts, and the estimated cost to Madison County. For instance, defendant complains that expert testimony was needed to counteract Dr. Case's testimony that defendant could not have been rendered unconscious for more than five minutes and remember the events immediately preceding the blow, that defendant could not have been oriented and capable of telling her story to her husband and the police shortly after gaining consciousness, and that she could not have remembered the blow delivered. However, defendant does not indicate if an expert exists who could counter Dr. Case's testimony, who this expert is, what his or her qualifications are, and what this expert would cost.

Additionally, defendant never established her indigency, a prerequisite to the receipt of county assistance under the statute. (Ill. Rev. Stat. 1989, ch. 38, par. 113—3(d).) At the motion hearing, defense counsel argued that defendant was unable to afford the hiring of experts. Defense counsel stated that defendant had no funds of her own but admitted that her husband was now back to work. However, defense counsel qualified his admission by stating, "He makes barely enough to eke by." Defense counsel also asserted that defendant had sold her house and that all available funds have been used already in her defense. While these statements were designed to show defendant's indigency, we find the statements by counsel to be self-serving and not based on sworn testimony. We also note defendant never filed an affidavit listing her assets and liabilities such as is required before counsel is appointed by the court (Ill. Rev. Stat. 1989, ch. 38, par. 113—3(b)), which would have been more persuasive on this issue. Furthermore, defendant employed private counsel to represent her at trial. She also posted cash bail in the sum of $40,000, which was later released to her when she was held without bond following the filing of the charge of murder. This evidence negated her unsupported claim of indigency.

Finally, we note the recent supreme court case of *People v. Peeples* (1993), 155 Ill. 2d 422. In that case, evidence was not properly preserved for testing, and other evidence tested in the State crime laboratory was not allowed to be tested by defendant's expert. The

supreme court held that, in spite of these problems, based upon the facts in the case, defendant was reasonably afforded an opportunity to prepare his defense. (*People v. Peeples*, 155 Ill. 2d at 480.) Based upon the facts in this case, we conclude that defendant was reasonably afforded an opportunity to prepare her defense in spite of being denied her requests for appointment of various experts. Thus, the trial court did not err in refusing defendant's motion for appointment and funding of these unknown experts.

### B. PUBLICITY AND SEQUESTRATION OF THE JURY

Defendant contends that the publicity about this case, from its inception and lasting throughout the trial, prevented her from obtaining a fair trial. Specifically, defendant asserts that she was unduly prejudiced by pretrial publicity which was generated with the approval and the encouragement of the prosecutor; by the court's failure to sequester the jury during trial, to frequently admonish the jurors to avoid media accounts of the trial, and to *voir dire* the jurors regarding the publicity's influence on them or to allow the defendant this opportunity. The State does not dispute the fact that this bizarre case generated an extraordinary amount of media attention but argues that defendant received a fair trial by an impartial jury.

The extent of publicity is not as important as what was reported and whether the jurors in this case were influenced by the publicity. After all, "Crimes, especially heinous crimes, are of great public interest and are extensively reported. It is unreasonable to expect that individuals of average intelligence and at least average interest in the community would not have heard of any of the cases which they are called upon to judge in court." (*People v. Taylor* (1984), 101 Ill. 2d 377, 386, 462 N.E.2d 478, 482.) Of paramount importance "is the assurance that a juror will be able to set aside all information he has acquired outside of the courtroom, along with any opinions he has formed, and decide the case strictly on the evidence as presented in the courtroom." (*Taylor*, 101 Ill. 2d at 386, 462 N.E.2d at 482.) In addition, the courts become very concerned about the impartiality of a jury when the jury is exposed through the media to highly prejudicial and inadmissible evidence, such as the prior criminal record of a defendant, the refusal to take or failure to pass a polygraph examination, purported confessions, or any other evidence excluded pursuant to a motion *in limine*. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639; *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478.) It is not the amount of publicity which is determinative, but what is important is that the defendant receive a fair and impar-

tial trial. (*People v. Lego* (1987), 116 Ill. 2d 323, 507 N.E.2d 800.) With these principles in mind, we now consider whether the defendant received a fair trial before an impartial jury.

■ Initially, we note that defendant requested a change of venue from Madison County, which the State did not oppose. The case was then transferred to Peoria County. The granting of this motion greatly reduced the impact of the pretrial publicity generated in Madison County, and the defendant has not shown how the local media in Madison County prejudiced the Peoria jurors. The next consideration must be whether the publicity in Peoria was prejudicial to the defendant, and, if so, was the jury prejudiced in its deliberations by this publicity and thereby unable to give defendant a fair and impartial trial.

This court has read all of the media reports generated in Peoria and submitted by the defendant, about the case *sub judice*. Of the reports reviewed, only two newspaper reports and two television broadcasts could possibly be considered prejudicial to the defendant. These reports involved evidence which was excluded by the defendant's motions *in limine*. In one newspaper report and the two television broadcasts, it was reported that defendant allegedly had marijuana in her bloodstream after Heather's abduction. These reports were published during *voir dire* of the jury. The other newspaper report, published on December 31, 1989, over a week prior to trial, reported that defendant and her husband had failed lie detector tests after Loralei's abduction, but not in Heather's alleged abduction. Because of the timing of these prejudicial publicity reports, we recognize the danger that the reports posed to defendant's right to a fair and impartial jury, but these reports were harmless as we discuss hereinafter. A review of the remainder of the publicity generated in Peoria before the trial reveals that the publicity was concentrated primarily at the time of Heather's disappearance in April 1989 and, thus, was removed in time from the trial.

With regard to the publicity which occurred during the trial, the media merely reported the evidence as it evolved, after it was heard by the jury. This publicity cannot be considered prejudicial to the defendant, even if the jury read or heard such summaries. However, there is no evidence that any juror actually violated his or her oath by reading or listening to such media reports.

During *voir dire*, the court asked the potential jurors several general questions before tendering the jurors to defense counsel and the prosecutor for further questioning. Specifically, the court inquired: (1) whether each juror had read or heard about the case through the media; (2) whether the information each juror had read or heard had

caused him or her to form an opinion in this case; and (3) whether each juror could disregard what she or he had read or heard and be fair and impartial. The jurors that were selected all indicated, except for one, Radosevich, that they had never expressed or formed an opinion about the guilt or innocence of defendant; that they had read or heard very little about the case; and that they could be fair and impartial. Defendant compares this case to *Dowd*, but in *Dowd*, 8 out of 12 jurors held the opinion that the defendant was guilty and that it would take sworn testimony to change their opinion. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) In the case at bar, Radosevich, the only juror who admitted to having formed an opinion, had never expressed his opinion to anyone else, and he stated that he had changed his opinion after understanding "how the system works," and that he presumed defendant to be innocent until proven guilty.

Further, defense counsel also questioned the jurors about their possible prejudice from the publicity, and again, all of the jurors selected denied that this information would influence their decision. In fact, many jurors not selected were excused for cause because of their exposure to publicity and because they had formed an opinion of the case. The defendant has not shown, nor can it be determined from the record, that she suffered prejudice or was denied a fair and impartial trial due to the publicity either before or during her trial.

■ Defendant next contends that the court erred in denying her motion to sequester the jury. The granting or denial of such a motion is within the sound discretion of the court and is not reversible error if the trial judge gives adequate warnings to the jury not to read or listen to press reports of the trial and no demonstration of actual prejudice is made by defendant. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402.) Here, the jurors were instructed several times throughout the proceedings not to read newspaper articles, not to listen to radio broadcasts, and not to watch television reports about the case. There is no evidence that the jurors were exposed to subsequent media reports after they were sworn or that the jurors violated their oath and instructions from the trial judge.

Further, the defendant did not raise any question about the adequacy of the warnings until the trial was almost over. Even then, defense counsel's only concern was that the jury might have heard something inadvertently during recesses. Since counsel never proved or made an offer of proof that the jury actually read or heard anything outside of the evidence adduced in the courtroom, defendant failed to show actual prejudice against her right to a fair trial.

■ Finally, defendant asserts that there was prosecutorial misconduct on the part of the assistant State's Attorney in generating publicity. It is true that the police initiated publicity on the advice of the FBI and with the approval of the prosecutor before the body of Heather was found, but that publicity was for the purpose of flushing out the murderer. Further, this publicity was generated in Madison County prior to the arrest of defendant. There is no proof that the jurors in Peoria were aware of this publicity, and in fact, the jurors selected indicated that they would not be influenced by what they had read or heard. The only publicity the prosecutor initiated during trial, about which defendant complains, was the prosecutor's announcement that he was going to spring a "surprise" on defendant's counsel, but the nature of this "surprise" evidence was not disclosed. This surprise was subsequently revealed at trial to be Dr. Case's testimony that defendant could not have been knocked unconscious and still remember all that she did. The defendant made no showing that the jury read or heard this announcement or, even if one or more jurors heard the announcement, that prejudice ensued.

We, of course, can second-guess the trial judge, and it is possible we might have taken some precautionary steps that hindsight affords us, such as warning the jurors more frequently not to read or listen to reports about the case. But how many times must a judge tell a jury that presumably has some modicum of intelligence not to read or listen to media reports about the trial? The trial judge could have excluded the press from the motion *in limine* hearing concerning evidence of marijuana in defendant's blood, but such exclusions usually result in more publicity and false reports. We find, therefore, that the publicity generated did not have an adverse influence on the jury; to hold otherwise would be pure speculation and contrary to the record.

### C. DENIAL OF CHALLENGES OF JURORS FOR CAUSE

Defendant asserts that the court erred in denying her challenges for cause of four jurors. After unsuccessfully challenging three of the prospective jurors for cause, she exercised peremptory challenges against those three. As to the fourth juror, which the defendant unsuccessfully challenged for cause, defendant had exhausted all of her peremptory challenges, and this juror was seated. Although defendant mentions in her brief all of the four jurors unsuccessfully challenged for cause, it is only the one juror seated about which the defendant centers her contentions.

■ Summarily, we find no merit to defendant's assertion that the unsuccessful challenges to the three jurors which were peremptorily

excused by her deprived her of a fair trial. There can be no claim of prejudice if these prospective jurors were not impaneled, because peremptory challenges are not of constitutional dimension and the loss of a peremptory challenge does not constitute a violation of a constitutional right to an impartial jury. (*Ross v. Oklahoma* (1988), 487 U.S. 81, 101 L. Ed. 2d 80, 108 S. Ct. 2273; *People v. Harris* (1992), 231 Ill. App. 3d 876, 596 N.E.2d 1363; *People v. Johnson* (1987), 162 Ill. App. 3d 952, 516 N.E.2d 343.) It is through the use of peremptory challenges that a fair and impartial jury is obtained. (*People v. Harris* (1992), 231 Ill. App. 3d 876, 596 N.E.2d 1363.) Having disposed of the defendant's contention regarding the three jurors not seated, we now consider defendant's contention that the court erred in denying her challenge for cause against the juror who was seated, Radosevich.

A court's refusal to excuse a juror for cause is a matter of discretion. (*People v. Seaman* (1990), 203 Ill. App. 3d 871, 561 N.E.2d 188.) On review, the court's determination of a person's competence to sit as a juror will not be overturned unless the court's decision is against the manifest weight of the evidence. (*People v. Peeples*, 155 Ill. 2d at 469.) The true consideration is whether the defendant received a fair and impartial trial. (*People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478.) It is defendant's burden to show, as the party challenging the juror, that Radosevich was not a fair and impartial juror. *People v. Seaman* (1990), 203 Ill. App. 3d 871, 561 N.E.2d 188; *People v. Peeples* (1993), 155 Ill. 2d 422.

Defendant first asserts that Radosevich was not a fair and impartial juror because he stated in *voir dire* that he had an opinion regarding defendant's guilt or innocence. Radosevich's responses to the questions of counsel were previously discussed, wherein Radosevich indicated that he had an opinion at a prior time of defendant's guilt or innocence, but that he no longer held an opinion after seeing how the system worked. Radosevich stated that he believed defendant was entitled to a fair trial and that she was presumed to be innocent.

▮ Additionally, defendant contends that Radosevich should have been excused for cause since he also indicated he would believe a police officer more than other witnesses. The pertinent questions, Radosevich's answers, and the usual ritual in a criminal trial whereby the juror is rehabilitated were as follows:

"MR. GROSHONG [defense counsel]: We expect to hear the testimony of some police officers. Do you think that by reason of their employment you would give their testimony any more credence or weight merely because of the nature of their employment?

JUROR: Yes.

MR. GROSHONG: Why is that?

JUROR: Well, that's their job. You know, that's what they get paid to do, so, you know, I would have to weigh their—what they say greater than another individual that's, you know—that's not part of their job.

MR. GROSHONG: Usually the police officers testify on the State's side of the case, don't they?

JUROR: Uh-huh.

MR. GROSHONG: Do you think that because the police officers testify on the prosecutor's side of the case, since you give their testimony greater weight, that that puts some kind of additional burden on the defense to prove her own innocence?

JUROR: No.

MR. GROSHONG: Does it put Paula in a position where she's already starting out with a black eye in this case?

JUROR: No.

\* \* \*

MR. GROSHONG: Mr. Radosevich, would the failure on my side of the case to call police officers to testify on my side of the case, knowing that the prosecutor will call them to testify, some of them, on his side of the case[,] would that put Paula at a disadvantage in your eyes?

JUROR: No.

MR. GROSHONG: How do you reconcile that with the earlier statement, sir, that you would give more weight to the testimony of police officers?

JUROR: Well, I think a police officer, his statements would be more credible is the only point I am trying to make.

MR. GROSHONG: I take it that you would judge the police officers' testimony by a standard different from that you would impose on other people?

JUROR: Yes.

\* \* \*

THE COURT: Let me ask you about a police officer's testimony. I don't want to put words in your mouth, but some jurors feel that a police officer might have more knowledge in a particular area, say on distances or particular police matters. But if you are instructed that you should treat the testimony of a police officer the same as you treat any other testimony as far as believability or credibility, would you do that?

JUROR: Yes.''

From this colloquy, it is reasonable to infer that the court found Radosevich willing to be a fair and impartial juror.

Defendant cites no authority that holds that Radosevich's responses automatically disqualify a prospective juror. In *People v. Jarosiewicz* (1977), 55 Ill. App. 3d 1057, 371 N.E.2d 949, the court held that the belief of a juror that a police officer would not commit an unprovoked act of violence on a citizen was not sufficient grounds to dismiss the juror for cause. Similarly, this court recently held that the fact the juror was friends with several Carbondale police officers in a Carbondale murder case was not sufficient grounds to excuse the juror. (*People v. Harris* (1992), 231 Ill. App. 3d 876, 596 N.E.2d 1363.) It would appear that the jurors in both *Jarosiewicz* and *Harris* may have been more "pro-police" than Radosevich was in the instant case; however, the jurors in those two cases were found to be fair and impartial. Finally, we note that in the recent supreme court case of *Peeples*, the court found that the trial judge did not err in refusing to strike a juror for cause who had sat on a previous murder case and who had found out afterwards that the State's hands were tied by the the rules of evidence, which he indicated was not a "valid process." We do not find that the court's refusal to excuse Radosevich for cause was against the manifest weight of the evidence, simply because Radosevich became entangled in the frequently occurring imbroglio of the hypothetical questioning as to what weight should a potential juror give to the unknown testimony of an unknown police officer versus the unknown testimony of an unknown witness.

## II. PROSECUTORIAL MISCONDUCT

The defendant's next issue for consideration is presented under what she terms "prosecutorial misconduct." Under this issue, she presents two subissues: (1) that the court erred in permitting Dr. Case, the pathologist in this case, to testify as an expert witness in neurology, and (2) that the prosecutor's improper profit motive denied her a fair trial.

### A. EXPERT WITNESS TESTIMONY

While it is not entirely an issue of prosecutorial misconduct, the defendant contends that the court abused its discretion in allowing Dr. Case to testify as an expert witness in neuropathology. Her argument of this subissue is twofold: (a) that the doctor was not qualified as an expert witness in this field because she had never treated live patients, and (b) that the doctor's surprise testimony regarding defendant's head injury and her related memory constituted a discov-

ery violation. We first address the defendant's assertion that Dr. Case was not qualified as an expert witness in the field of neuropathology.

A person may testify as an expert where his or her experience and qualifications afford the witness knowledge not common to lay persons and where the testimony will aid the trier of fact in reaching its conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) Whether a witness qualifies as an expert is within the discretion of the trial court. *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.

■ Here, the record reveals that Dr. Case was qualified to testify as an expert in neuropathology. Dr. Case's testimony revealed that she completed a two-year residency in this field, and that she was board certified in this specialty. She enumerated her substantial experience, training, and research in this area. Dr. Case further testified that she has published works in the field, has acted as a consultant, and has given a considerable number of lectures and seminars in neuropathology. She is one of the foremost experts in this field. While Dr. Case had not treated live patients, she had examined persons with head injuries, especially in child abuse cases, to determine their cause. Dr. Case's experience and knowledge qualified her as an expert in neuropathology, and her knowledge could be considered at least equal to, if not greater than, the knowledge of Dr. Kim and the nurse at the hospital, both of whom examined defendant and testified to the effect a blow to the head would have had on defendant.

In addition, Dr. Case's testimony regarding the effects on memory as a result of unconsciousness from a blow to the head aided the jury in evaluating the defendant's testimony. While it may be true that most lay persons have some knowledge of the effects that a blow to the head may have, the doctor's testimony on retrograde amnesia and the degree to which a person is able to function after a head injury was not information that was common knowledge to a lay person. The court did not abuse its discretion in allowing Dr. Case to testify as an expert in neuropathology.

The second prong of defendant's argument relates more to the charge of prosecutorial misconduct. This issue, out of all the issues raised, presents the most difficulty to this court. The defendant contends that the testimony of Dr. Case regarding neuropathology was a surprise to her and violated the discovery rules. She claims that she was not advised prior to trial as to the substance of Dr. Case's testimony regarding her head injury, her ability to function as a result of the injury, and the retrograde amnesia corresponding to extended unconsciousness from a head injury. The defendant claims she was only

aware that Dr. Case was being called to testify about the autopsy of Heather, *i.e.*, as a forensic pathologist. Defendant contends that these facts constitute a violation of Supreme Court Rule 412(a)(iv) (134 Ill. 2d R. 412(a)(iv)) and hence reversible error.

Rule 412(a)(iv) provides in pertinent part as follows:

"(a) *** the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

* * *

(iv) any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert." 134 Ill. 2d R. 412(a)(iv).

This whole controversy arose because of the prosecutor's announcement to the press that he was going to present a "surprise" to the defendant in his case the next day. We are not certain as to the prosecutor's motives to incur such an unnecessary risk to his case by this announcement. The experienced defense counsel, of course, seized the golden opportunity presented to him by objecting strenuously to the "surprise" in his post-trial motion and on appeal.

This court must now transcend all the trial maneuvering, aspirations of counsel, and personal games that counsel sometimes engage in with their opposition by deciding if reversible error was committed due to the "surprise." This requires that we review the totality of the circumstances surrounding the testimony of Dr. Case.

Defendant's counsel never objected at the trial to Dr. Case's testimony concerning the impossibility of defendant's story on the grounds of surprise. Defense counsel's objection at trial was to Dr. Case's qualifications to testify as an expert in the field of neuropathology because of her lack of experience in treating live persons. Counsel's objection on the grounds of surprise was first made to the court in a post-trial motion. Counsel never asked *on the record* before, during, or after the testimony of Dr. Case for a continuance of any kind. Defense counsel and the prosecutor discuss and argue vague memories, during the post-trial hearing, as to what occurred off the record during the trial concerning a possible request for a continuance. The objection to Dr. Case's testimony because of the "surprise" only arose after the trial and after defendant's counsel was preparing his post-trial motion.

We note that the prosecutor disclosed the name of the witness, Dr. Case, and that the witness was an expert in the field of medicine,

more particularly in forensic pathology. Second, the prosecutor disclosed that the witness was an expert in neuropathology, and her curriculum vitae was provided to the defendant, wherein her credentials in the field of neuropathology were enumerated. A listing of her published works as to neuropathology and *head injuries* was a part of this document. Further, defendant had an opportunity to interview Dr. Case, and although it is not apparent that she availed herself of the opportunity to depose Dr. Case for this case, she did depose the doctor for the related juvenile case concerning the custody of the defendant's son.

The fact that a prosecutor will routinely attack defendant's version of the events and defendant's credibility should come as no surprise to even an inexperienced defense counsel. When the statements that defendant made to the police on the night of and the morning after the alleged abduction were reviewed by defense counsel, it should not have surprised defense counsel that a prosecutor would view the defendant's story as being very weak and unbelievable as to the head injury. The ordinary lay person would know, from experience or knowledge of car wrecks, sporting events, and other accidents, that a blow to the head knocking a person out for 45 minutes would be a very serious matter. The ordinary lay person would at least question the ability of a person receiving such a blow, upon being revived, to jump up, run up and down stairs, make the suggestion and retrieve the number to call the police, and give statements to the police until 8 a.m. the next morning without any sleep, rest, or incapacitating headache. Counsel for the defense does not and cannot claim surprise that the State would attack defendant's story of what occurred the night of the alleged abduction.

Defendant did not claim surprise at the testimony of Dr. Kim and the nurse at the hospital, who examined defendant within hours after the alleged blow, concerning their disbelief of defendant's statement that she had been struck in the head and knocked out for approximately 45 minutes. Moreover, Dr. Case's testimony, although more technical than Dr. Kim's and the nurse's testimony, was cumulative. It should not have come as a surprise that the prosecutor would attempt to obtain an opinion as to the impossibility or unlikeliness of defendant's story from every medical and even nonmedical witness called.

The most damaging evidence against defendant's argument of surprise, other than her failure to make a timely objection, came in two pretrial hearings held five months before the trial commenced, wherein Officer McClain testified in response to cross-examination by defendant's counsel in both hearings that the State had a doctor who

would testify that defendant's claim of being knocked unconscious was inconsistent with her report of events and, therefore, an impossibility. For some reason, counsel did not pursue the questioning about this witness.

Defendant cites *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 584 N.E.2d 963, which was affirmed by the supreme court (*Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1992), 154 Ill. 2d 543, as authority that our courts condemn undisclosed expert testimony. Defendant asks why would we require stricter disclosure in civil cases than we do in a criminal case, when a defendant's liberty is in jeopardy? The answer is that we condemn the nondisclosure of experts in both types of cases. There are, however, different rules and different ways for disclosure to be made in civil and criminal cases. In the case *sub judice*, there was disclosure that two medical experts were going to testify, what their fields of expertise were, and generally what they were going to testify about. In *Wakeford*, the court felt that there was a violation of Supreme Court Rule 220, because the witness was not disclosed as being an expert, and so plaintiff had no way of knowing that the witness was being called to give an expert opinion. (134 Ill. 2d R. 220(b)(1).) Here, Dr. Case was disclosed as an expert, and her fields of expertise were disclosed, so that defendant could not help but be aware that she would give an expert opinion. If the investigating police officer in *Wakeford* had been listed as an expert, and his field of expertise as to the distribution of crime in Alton had been disclosed, then the results may have been different. *Wakeford* is, therefore, distinguishable from the present case.

There are numerous criminal cases whereby experts were allowed to testify even when their existence was not fully disclosed or the gist of their testimony was not fully revealed to defense counsel. (*People v. Carr* (1989), 188 Ill. App. 3d 458, 544 N.E.2d 978; *People v. Fleming* (1987), 155 Ill. App. 3d 29, 507 N.E.2d 954; *People v. Scheidt* (1986), 142 Ill. App. 3d 844, 492 N.E.2d 248; *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466; *People v. Taylor* (1982), 107 Ill. App. 3d 1019, 438 N.E.2d 565; and *People v. Davis* (1982), 105 Ill. App. 3d 129, 434 N.E.2d 13.) We cannot distinguish these cases from the present case, as each of these cases holds there was no surprise or prejudice to defendant, as defendant should have known there was going to be expert opinion given that would be damaging to defendant's case. Neither the State nor the defendant, to use an old expression, is required "to draw a picture" for the other side as long as the party does not hide the existence of the expert, the field of expertise,

and the gist of the expert's testimony, if requested. Here, defendant was told, in one form or another, the name of Dr. Case and her fields of expertise and that there would be a medical expert testifying about the impossibility of defendant's story as to her ability to remember.

Defendant was given sufficient time and warning that her story was going to be attacked by expert testimony, as she had five months' warning from the pretrial hearings, two mentions of the testimony in the prosecutor's opening statement, and the presentation of Dr. Case's testimony in the State's case in chief rather than in rebuttal. When defendant was called to testify, she was prepared and attempted to explain away her statements on the night and morning after the alleged abduction about the length of time she was rendered unconscious. We find that the trial judge did not err in denying defendant's post-trial motion for a new trial due to Dr. Case's testimony.

■■■ We also note that the defendant cites two prior opinions of this court, *People v. Barton* (1984), 122 Ill. App. 3d 1079, 462 N.E.2d 538, and *People v. Barton* (1989), 190 Ill. App. 3d 701, 546 N.E.2d 1091, that were critical of this particular prosecutor's conduct, when he was the State's Attorney of Madison County, to support her claim of prosecutorial misconduct. The *Barton* cases do not act as prior convictions of the prosecutor so that every time he appears in a case bad motives can be imputed to his every act. The prosecutor may have "showboated" on occasion, but so did defense counsel. In reviewing the transcript of this trial, we do not discern any misconduct on the part of the prosecutor that shows "there has been a clear denial of due process." *Barton*, 190 Ill. App. 3d at 708, 546 N.E.2d at 1095.

### B. PROSECUTOR'S CONFLICT OF INTEREST

Defendant's second contention of prosecutorial misconduct is that the prosecutor should have been disqualified, as his agreement to write a book about this case presented a conflict of interest which deprived her of a fair trial. It is the defendant's position that, because the prosecutor was motivated by profit, she was deprived of a fair trial. We find this contention to be without merit.

■■■ In the first instance, we note that we need not consider this argument of defendant, as she fails to cite any relevant authority, in violation of Supreme Court Rule 341(e)(7). (134 Ill. 2d R. 341(e)(7); *Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605, 505 N.E.2d 387.) Further, her argument is conclusory and speculative, and the defendant cites no specific instance of how the prosecutor's pecuniary interest conflicted with his prosecution of her. We note that

defendant does assert that the prosecutor's attempt to have the death penalty imposed upon her is an example of his tactics being dictated by his "profit motive," as a death penalty evokes more interest and, hence, more potential sales for his book. However, this argument is meritless, as this case was an appropriate case in which to seek the death penalty, and we will not second-guess a prosecutor's discretionary decision to seek such a sentence.

Nevertheless, for a court to disqualify a prosecutor and appoint a special prosecutor, the prosecutor must be interested in the outcome of the case, *i.e.*, either as a private individual or because his office is a party to the action. (*Baxter v. Peterlin* (1987), 156 Ill. App. 3d 564, 509 N.E.2d 156.) To support the removal of a prosecutor, the petitioner must plead and prove specific facts of the prosecutor's interest, as well as facts which show the prosecutor would not zealously represent the People of the State of Illinois because of this interest. (*Baxter v. Peterlin* (1987), 156 Ill. App. 3d 564, 509 N.E.2d 156.) Here, the defendant has not shown that the prosecutor did not zealously prosecute her, and in fact, the defendant seems to take exception to the prosecutor's doing exactly that. As we stated previously, the defendant's argument is conclusory, general, and speculative, and there is no apparent reason of record to show that the prosecutor had a conflict of interest during the defendant's trial which deprived her of a fair and impartial proceeding.

### III. EVIDENTIARY RULINGS

The next main contention raised by the defendant is that she was denied a fair trial by several of the court's evidentiary rulings. Specifically, the defendant asserts that the court abused its discretion: (1) in admitting and in failing to limit the State's evidence of other crimes; (2) in allowing the State to present "reenactment" evidence; (3) in refusing defendant's surrebuttal testimony regarding the "coaching" of a State's rebuttal witness; (4) in allowing a State's witness to testify regarding the defendant's credibility; and (5) in excluding defendant's evidence which created doubt as to her guilt. We find that the court's rulings concerning these evidentiary matters were not an abuse of discretion for the reasons set forth below.

#### A. EVIDENCE OF OTHER CRIMES

Defendant contends that the evidence presented by the State of the circumstances surrounding the disappearance and death of Loralei, defendant's firstborn daughter, in June 1986, should not have been presented, as it was evidence of another crime and was more

prejudicial than probative. Further, defendant argues that this evidence was inadmissible because it did not show that the defendant committed or participated in the murder of Loralei, or even that a crime had occurred. The defendant also argues that, even if this evidence was properly admitted, the evidence should have been limited by the trial court as to the scope of evidence presented. We disagree.

It is well established that evidence of other crimes for which a defendant is not on trial is inadmissible if it is relevant merely to show a propensity to commit crime. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.) The reason for prohibiting this evidence is that such evidence overpersuades the jury, which may convict the defendant simply because he or she is a bad person deserving punishment. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.) An exception to the general rule is that other-crimes evidence is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime, *i.e.*, to show intent, identification, motive, absence of mistake, or *modus operandi*. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.) Proof of other crimes need not be beyond a reasonable doubt when offered to show a common scheme or *modus operandi*, but it must be more than speculative. (*People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 469 N.E.2d 305; *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334.) The decision to admit evidence of other crimes is a matter of discretion left to the trial court, and absent an abuse of discretion, the court's determination will not be overturned on review. (*People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334.) Further, if the jury is limited in its consideration of other-crimes evidence by the court's instructions, the prejudicial impact of the evidence is substantially reduced. *People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 469 N.E.2d 305.

In this case, the evidence presented regarding Loralei's death in June 1986 can be summarized as follows: At about 10:30 p.m., on the evening of June 17, 1986, a white male intruder, wearing a dark ski mask and armed with a gun, came into the defendant's home when she was alone and her husband was at work. This intruder had the defendant lie down on the floor. The intruder then grabbed Loralei from her bassinet and left the house without taking anything else of value from the home. No one other than defendant saw the intruder, and no sign of an intruder was found by the police. No ransom for Loralei was ever sought by the intruder. Loralei's nude body was found approximately 150 feet from the defendant's home in a heavily wooded ravine about a week after her disappearance. Medical testi-

mony established that Loralei's death was a homicide. The defendant was never charged with the murder of Loralei, but she was charged with concealment of a homicidal death and obstruction of justice in connection with Loralei's death. The record does not disclose the outcome of those charges.

 We find that this evidence was admissible as reflecting a common scheme or *modus operandi* in the deaths of Loralei and Heather, and that the common denominator in the deaths was the defendant. In both Heather's and Loralei's deaths, the occurrences happened when the defendant was alone and her husband was at work; both occurred at about 10:30 p.m.; no ransom was sought in either alleged kidnapping; no evidence of an intruder was found in either case; the "intruder" took only the two babies and nothing else of value; the "intruder" wore a ski mask and carried a gun in both incidents; both babies were found naked; both victims were females; and both children were found dead in close proximity to the defendant's home. The evidence of Loralei's disappearance was admissible because it was substantially similar to the unusual circumstances of Heather's death. It also revealed the lack of coincidence and the implausibility of the defendant's explanation of the two cases. Additionally, these common features were sufficient, in and of themselves, to establish a distinctive combination suggesting the work of one person, that person being defendant. *People v. Smith* (1992), 236 Ill. App. 3d 1060, 602 N.E.2d 1388.

We find this case is analogous to *People v. Hanei* (1980), 81 Ill. App. 3d 690, 403 N.E.2d 16. In *Hanei*, this court found that the evidence of the death of Katie Roessel, which occurred five years before the murder of the defendant's father, the case for which he was tried, was admissible even though the evidence constituted evidence of another crime. The defendant's father died from thallium poisoning from doughnuts which were found by the defendant outside his father's house and which defendant encouraged his father to eat. Prior to his father's death, the defendant had asked an attorney to prepare a deed transferring residential property owned by his mother and father to him. The evidence regarding Katie Roessel's death was that an autopsy on her exhumed remains indicated that she had died from cardiovascular collapse due to thallium poisoning. The defendant had known Roessel for four or five years before her death. It was also shown that a couple of weeks prior to her death, the deed to her 160-acre farm was transferred to a Frieda Kriesol (a fictitious person) and then to Leo Soberri, Sr., for whom defendant had a power of attorney. The deed to Roessel's property was transferred from Soberri to

the defendant the same day that the property was deeded to Soberri. This court determined that the character of the deaths of defendant's father and Roessel were similar and the *modus operandi* gave the appearance that the two deaths derived from a common source. The defendant in *Hanei* was not prosecuted for Roessel's murder. The same reasoning applies to the case *sub judice*, as the deaths of Heather and Loralei were similar, and they gave the appearance of deriving from a common source.

Further, the defendant's assertion that the court should not have permitted the quantity of evidence presented regarding Loralei's death is not well taken. The defendant contends that the court determined it did not have discretion to limit the evidence, which she claims is reversible error. The defendant bases her assertion upon the statement made by the court when it denied her request to limit the evidence, which was as follows: "Now I don't think I can limit the State, and I will not, but if something comes up at trial where you feel you should object, you should object." It is this language that the defendant asserts discloses the court's belief that it lacked discretion to limit the evidence. We do not interpret the court's statement as the defendant does. We find that the court was simply expressing its inability to limit the evidence because it did not know what that evidence was to be. Without knowing the evidence, it would be impossible for a court to limit it. Further, the court exercised its discretion and declined to limit the evidence. The court encouraged the defendant to object when necessary during the presenting of the other-crimes evidence, which revealed the court's knowledge that it had discretion to limit the evidence and would exercise this discretion when it was appropriate to do so.

In addition, the jury was instructed to consider the evidence of Loralei's death solely on the issue of the defendant's intent, knowledge, lack of accident, and *modus operandi*. By so instructing the jury, the prejudicial impact of this evidence was substantially reduced. (*People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 469 N.E.2d 305.) The court did not abuse its discretion in allowing the evidence of Loralei's death or refusing to limit the evidence as the defendant requested.

### B. "REENACTMENT" EVIDENCE

The defendant contends that the court abused its discretion in permitting the State to show the jury a videotape of the reenactments of the events surrounding Loralei's disappearance in June 1986. It is undisputed that the defendant presented a motion *in limine* in which

the defendant sought to have the videotape in question excluded from the jury's consideration, and that the court granted the defendant's motion. Subsequently, the videotape was shown to the jury, after the court determined that extensive cross-examination had elicited the existence of the videotape and what the tape contained.

■■ This court has previously ruled that recreation of the scene of a crime is similar to demonstrative evidence, and as such, the admissibility of such evidence is left to the discretion of the court. (*People v. Proper* (1979), 68 Ill. App. 3d 250, 385 N.E.2d 882.) Further, when a defendant " 'procures, invites or acquiesces in the admission of evidence, even though it be improper, he cannot complain.' " (*People v. Payne* (1983), 98 Ill. 2d 45, 50, 456 N.E.2d 44, 46, quoting *People v. Burage* (1961), 23 Ill. 2d 280, 283, 178 N.E.2d 389.) Here, the court did not abuse its discretion as the defendant "opened the door" for the evidence of the videotape when he cross-examined the State's witnesses about the videotape and the circumstances under which the videotape was made. Without enumerating specifics, suffice it to say we have reviewed the testimony about the videotape. We find that the testimony elicited in defendant's extensive cross-examination and the subsequent testimony presented on redirect examination revealed much of the content of the videotape, and thus, the showing of the videotape was practically superfluous. Further, the defendant referred to this evidence as "manufactured" evidence on the part of the State in front of the jury, and this portrayal of the evidence gives added impetus for the admission of the videotape. In addition, because of defendant's extensive cross-examination, many of the discrepancies between the defendant's testimony and the events portrayed in the videotape were brought to the jury's attention, thereby leaving the weight of the videotape evidence in the hands of the jury. We also note that, prior to the showing of the videotape, the court admonished the jurors that it was for them "to determine what weight to give this film, and that is based upon the circumstances, similarities or dissimilarities found to exist between the experiment and what you have heard in court." Based on these circumstances, the court did not abuse its discretion in allowing the jury to view the videotape.

C. SURREBUTTAL TESTIMONY

The defendant's next contention is that the trial court abused its discretion when it denied the admission of her surrebuttal testimony that the State's rebuttal witness' identification of her was coached by the prosecution. However, the defendant actually argues that the State's rebuttal witness' testimony should have been excluded because

the testimony went beyond the scope of the defendant's testimony. Specifically, the defendant asserts that the State's rebuttal witness, Gisela Rasp, testified that she saw the defendant with Loralei at her card shop before the baby's alleged disappearance, which contradicted the defendant's testimony that she had not had Loralei out of the house after her birth. The defendant goes on to state that this witness' testimony, then, exceeded the scope of her testimony and established new evidence that, when Rasp saw Loralei, she was silent and unmoving with an open-eyed stare, thus implying that Loralei was already dead before her disappearance.

The law on permitting surrebuttal testimony is that the court has discretion to refuse to allow this testimony if no new matters were raised in rebuttal. (*People v. Williams* (1989), 180 Ill. App. 3d 294, 535 N.E.2d 993.) On review, the question then becomes, did the trial court abuse its discretion in denying the surrebuttal testimony which resulted in manifest prejudice to the defendant? *People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726.

 Here, the evidence defendant sought to present in surrebuttal (coaching of the witness) does not counteract the new evidence she asserts was presented in the rebuttal testimony of Rasp, *i.e.*, the implication that Loralei was already dead. Further, the defendant presented the testimony of other witnesses in surrebuttal, wherein they testified that they had called the defendant's home after Rasp had seen Loralei with the defendant, and that they had heard the baby crying in the background, counteracting Rasp's testimony. Thus, defendant suffered no manifest prejudice from the "additional evidence" she argues was presented by Rasp.

Additionally, we do not find that, if Rasp's testimony were somehow "coached" as the defendant initially states, the court's denial of defendant's surrebuttal testimony for this purpose caused her manifest prejudice. The testimony of Rasp was weak evidence presented by the State to negate the defendant's testimony that she had not had Loralei out of the house after her birth and prior to her disappearance. Rasp's testimony added little, if anything, to convict the defendant of the murder of Heather. Therefore, we do not find that the denial of defendant's surrebuttal testimony was manifestly prejudicial to the defendant, and the trial court did not abuse its discretion in denying this testimony.

### D. REBUTTAL TESTIMONY

The defendant also contends that the testimony of the State's rebuttal witness, FBI Agent Schultz, should have been excluded on the

defendant's motion, as his testimony was opinion evidence and invaded the province of the jury by commenting on the credibility of the defendant. Defendant asserts that the testimony was beyond the scope of permissible rebuttal testimony and was highly prejudicial. The defendant further alleges that the agent's explanation of why he was in a wheelchair cloaked the agent with valor and invoked sympathy, thereby augmenting the witness' veracity.

Agent Schultz was called by the State to rebut the testimony of defendant's husband that he was lied to by the agent about evidence in the FBI's possession in order to obtain a confession from the defendant. The agent's testimony explained the circumstances of the interview with the defendant's husband and revealed exactly what was said to the defendant's husband to show that the agent did not lie to him. The specific statement by Agent Schultz about which the defendant complains was as follows:

> "Well, I told him the two stories regarding the two abductions were totally preposterous and that no jury in their right mind would believe those stories ***."

At the time of the statement by Agent Schultz, the defendant objected by stating: "I'm going to object to this kind of testimony." The court overruled the defendant's objection, finding that the testimony was what the agent told defendant's husband.

■■■ Initially, we note that the defendant has waived this issue. Failure to state specific grounds for objection waives that issue for appeal. (*People v. Johnson* (1991), 219 Ill. App. 3d 949, 579 N.E.2d 1291.) Here, the defendant made a general objection to the testimony. Such an objection fails to bring to the court's attention the problem with the testimony and does not allow the court an opportunity to make a valid consideration. Thus, the defendant has waived this issue.

Further, even if the issue were not waived, we find the argument meritless. Defendant has offered no cases, and we can find none that hold that comments by another witness such as were made here invaded the province of the jury to determine the credibility of the witnesses. Agent Schultz's statement was made after the jury had already heard the State's evidence and the defendant's evidence. The jury was very much aware, at that time, of the strengths and the weaknesses of the defendant's explanation of events. Further, given the circumstances under which the statement was made, it appears that the statement was not made to establish defendant's lack of credibility but was, as the court asserted at trial, an explanation of what the agent said to the defendant's husband in order to encourage him to obtain a confession from the defendant. The jury was astute

enough to recognize the agent's statement as being his opinion and not a statement of fact. In addition, the defendant asserted during her testimony that several of the witnesses were "mistaken" in their testimony, the inference being that these witnesses also lied. If Agent Schultz's statement is found to be an invasion of the jury's province to determine a witness' credibility, the same reasoning would apply to the defendant's assertions at trial as well. We find no logical or legal reason to find that Agent Schultz's statement was prejudicial error.

### E. DENIAL OF OFFER OF PROOF

The defendant's next contention is that the court erred in denying her offer of proof regarding evidence of her innocence. She argues that her offer of proof presented "negative" evidence of innocence.

This offer of proof to support her theory that someone else abducted and murdered her daughter consisted of the following: Joy Hokenson's testimony that, on May 3, 1989, the day Heather's body was discovered, she witnessed a man handing a bundle to another person in a car. The bundle she saw was wrapped in a baby afghan, but Hokenson did not see what was inside the bundle. This transference incident occurred at about 8:30 a.m., about a block from the bridge in Alton, Illinois, which led to the public access area where Heather's body was found.

The other evidence the defendant asserts should have been admitted was that there were shoe prints found at the site of the discovery of Heather's body, and these prints were determined not to match any footwear belonging to defendant, her husband, or her parents. The shoe prints were found at approximately 9 p.m. the evening of May 3, 1989, about 40 feet from the trash barrel where Heather's body was found.

The law is well established that a defendant is entitled to attempt to prove that someone else committed the crime with which he or she is charged, but that this right is not without limitations. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) Defining the limits of such evidence is difficult, but first and foremost in this determination is relevancy. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) A court may reject this evidence on grounds of irrelevancy if the offered evidence has little probative value due to remoteness, uncertainty, or its possible unfair prejudicial nature. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) A court's ruling as to the admissibility of the proffered evidence of innocence will not be reversed unless it is shown that the court abused its discretion. (*People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) Here, we do not find that the

trial court abused its discretion when it denied the defendant's offer of proof of her evidence of innocence.

■■■ The evidence proffered by defendant is too uncertain and remote to be of any probative value. The bundle-transfer evidence occurred almost two to four hours before the body of Heather was even placed into the trash barrel and almost six miles away from the barrel. This incident took place in broad daylight in the middle of a busy intersection of Alton, Illinois. There was nothing to link the man transferring the bundle to the alleged intruder described by the defendant in her testimony. Furthermore, there is no evidence that the bundle contained a baby. We also note that Heather's body was found in a plastic trash bag and not in a baby afghan. This evidence was totally irrelevant.

Similarly, the evidence of the shoe prints was lacking in probative value. The area where the shoe prints were found was 40 feet away from the trash barrel where Heather's body was deposited. The trash barrel was only three feet away from the parking lot of the access area in the riverside park. In addition, the trash barrel in which the baby's body was deposited was near a comfort station, an area which would naturally generate a lot of foot traffic in a public place. There was evidence of other persons being in the park that day. There also was no evidence of when the shoe print was made. The shoe print may have been made at any time before or after the body was left in the trash barrel. The remoteness and uncertainty of this evidence rendered it irrelevant. The court did not abuse its discretion in denying the defendant's offer of proof of this evidence.

### IV. REASONABLE DOUBT

The defendant contends that she was not proven guilty beyond a reasonable doubt. Her argument under this issue is two-pronged: that jurisdiction and venue of the offense were not proven beyond a reasonable doubt, and that she was not proven guilty of the offenses of murder and concealment of a homicidal death beyond a reasonable doubt.

#### A. JURISDICTION AND VENUE

Defendant argues that the State failed to prove that it had jurisdiction to prosecute her for the offense of murder beyond a reasonable doubt because it did not show that Heather's murder occurred in this State. Defendant asserts that the presumption arises that the offense of murder occurs where the body is found, in this case in Missouri. Therefore, the State had no jurisdiction to prose-

cute her in Illinois. Further, the defendant contends that the State did not prove beyond a reasonable doubt that Madison County was where the offense occurred and, therefore, the county of proper venue.

Generally, a person is subject to prosecution in this State if an offense is committed either wholly or partly within the State. (Ill. Rev. Stat. 1989, ch. 38, par. 1—5(a)(1); *People v. Holt* (1982), 91 Ill. 2d 480, 440 N.E.2d 102.) The statute provides that an offense is partly committed in this State if "the conduct which is an element of the offense, or the result which is such an element, occurs within the State." (Ill. Rev. Stat. 1989, ch. 38, par. 1—5(b).) In a homicide, if the body is found in the State, the death is presumed to have occurred in Illinois. (Ill. Rev. Stat. 1989, ch. 38, par. 1—5(b).) If there is no presumption arising from the finding of the body in Illinois, then jurisdiction must be proven beyond a reasonable doubt. *People v. Holt* (1982), 91 Ill. 2d 480, 440 N.E.2d 102.

Likewise, venue is a material element of an offense which must be shown beyond a reasonable doubt, *i.e.*, that the county where the prosecution is brought was the county in which the offense occurred. (*People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 564 N.E.2d 850; *People v. Page* (1990), 196 Ill. App. 3d 285, 553 N.E.2d 753; *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144.) Venue may be shown by circumstantial evidence and is proved if there is evidence from which it can be inferred that the crime was committed in the county where the prosecution took place. (*People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 564 N.E.2d 850; *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144.) If venue is controverted, this issue must be submitted to a jury for resolution. (*People v. McClain* (1978), 60 Ill. App. 3d 320, 376 N.E.2d 774.) We find that the State established through its circumstantial evidence both jurisdiction and venue for prosecution of the offense of murder beyond a reasonable doubt.

Although Heather's body was found in Missouri, it was clear that the act of murder did not occur where the body was found. Dr. Case's testimony established that Heather had died around the time of her disappearance, and that her body was frozen after her death. Heather's body was discovered in Missouri on May 3, 1989, four days after her alleged abduction. The evidence revealed that the trash bag containing Heather's body was not placed in the trash barrel before 10:30 a.m. on May 3, 1989, but that the bag was present after 1 p.m.

■■■ Further, we find that it was a reasonable inference that Heather was murdered in Alton, in Madison County, Illinois. This inference is supported by the evidence that the trash bag in which Heather's body was found was taken from the defendant's home. If an intruder intended to keep the baby alive, there would have been no need for a trash bag to have been taken. We agree with defendant's argument that the taking of the trash bag was to hide the baby when removing her from the home. It would make no sense, however, to place a live baby in a trash bag, due not only to the possibility of suffocation but also due to the possibility of the baby crying out and calling more attention to the trash bag than just carrying the baby in one's arms. The jury could have found, and the defendant seems to agree in her argument if you proceed to the logical conclusion of defendant's supposition, that the killer meant to use the trash bag as a means to hide Heather's body. The jury could have deduced from the evidence that the baby was dead before it left defendant's house in the trash bag. This conclusion is consistent with the medical evidence that Heather died by suffocation but that the suffocation resulted from a hand being placed over her nose and mouth and not by simple suffocation which might have resulted from Heather being placed in a plastic bag. The trash bag evidence combined with the medical testimony presented sufficient evidence to infer and prove jurisdiction and venue in Madison County, Illinois, beyond a reasonable doubt.

There is another reason that the jury could find jurisdiction and venue in Madison County, Illinois. Defendant wants us to concentrate on Heather's body, because of lack of testimony as to the location of the body from April 29, 1989, to May 3, 1989, and to forget all of the rest of the evidence. If, however, the evidence showed that defendant was the murderer, which the jury so found, and we concentrate on the whereabouts of defendant from April 29 to May 3, then we must conclude that the murder of Heather occurred in Madison County, Illinois. The defendant testified that she was in Madison County, Illinois, on the day of April 29, when her husband went to work, and that she stayed in Madison County through May 3. There was corroborating testimony by other witnesses as to defendant's whereabouts, at least to a portion of the time, on April 29 and April 30. Thus, if proof is sufficient to show that defendant was guilty of or participated in the murder of Heather, then jurisdiction and venue were proven by circumstantial evidence to be in Madison County, Illinois. If the proof was insufficient against defendant to show guilt of the murder of Heather, then jurisdiction

and venue, under this reasoning, might not lie in Madison County, Illinois. Of course, if the evidence is not sufficient to prove defendant guilty beyond a reasonable doubt, then the jurisdiction and venue questions are moot.

Finally, we note that the jury was instructed that it must find that Heather's murder occurred in Madison County, Illinois, in order to find the defendant guilty of the offense of murder. Because of the guilty verdict returned by the jury, it obviously resolved this controverted issue against the defendant. We affirm the jury's determination.

### B. THE OFFENSES

The defendant next contends that the State failed to prove her guilty of the offenses of murder and concealment of a homicidal death beyond a reasonable doubt. The defendant's argument is concerned primarily with her murder conviction. She asserts that, because the evidence against her was totally circumstantial, all it proved was that she had an opportunity to commit the murder, which was insufficient to prove her guilty beyond a reasonable doubt. She states there is no evidence as to who killed Heather and hid her body. Further, she argues that the State's evidence does not negate that an intruder committed the crimes. We disagree.

On appeal, a challenge to the sufficiency of the evidence is reviewed under the standard of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Sutherland* (1992), 155 Ill. 2d 1.) Where, as here, the evidence is circumstantial, the standard is the same as when direct evidence supports a conviction. (*Sutherland*, 155 Ill. 2d at 17.) A reviewing court will not substitute its judgment for that of the trier of fact in determining the credibility of the witnesses and the weight of the evidence. (*Sutherland*, 155 Ill. 2d at 19-20.) When a defendant's guilt or innocence rests upon the credibility of the witnesses, the trier of fact must resolve any conflicts in the evidence presented by their testimony. (*People v. Sullivan* (1989), 183 Ill. App. 3d 175, 538 N.E.2d 1376.) A jury is not required to believe a defendant's testimony. (*People v. Sullivan* (1989), 183 Ill. App. 3d 175, 538 N.E.2d 1376.) Lastly, a criminal conviction will only be reversed if the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*Sutherland*, 155 Ill. 2d at 17.) When viewed in the light most favorable to the State, we find that the evidence was

not so unreasonable or improbable that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

██ Here, the evidence which was presented established that the defendant was home alone with her son and Heather on the night of the incident. The defendant was the only witness who testified as to the presence of an intruder. No other evidence was presented that an intruder had been present, *i.e.*, no evidence of disarray was found in the house and no evidence was presented of a forced entry. Even trained police dogs could not support defendant's claim of an intruder. The only objects removed from the house were Heather and a plastic trash bag. The forensic evidence established that the plastic bag was from the defendant's home. The evidence revealed that Heather died approximately the same time as her alleged abduction.

Additionally, the defendant's credibility was undermined greatly throughout the trial. Her testimony that she was knocked unconscious was negated by the nurse at the emergency room, by the examining doctor at the emergency room, and by Dr. Case. Once it became apparent that the defendant could not have been knocked unconscious that evening, the only logical explanation was that she lied, and her failure to tell the truth about the events of her head injury eroded her testimony of there being an intruder, especially when only her testimony established his presence.

When this evidence is considered with the evidence of a similar occurrence which happened three years before to her first daughter, the defendant's explanations become even more implausible. This was reinforced by the defendant's testimony at trial, where, for the first time, she stated that the same intruder abducted both of her daughters. It is apparent that the jury found the defendant's testimony incredible, and we do not find that determination unreasonable. Once the jury disbelieved defendant's story of an intruder, then the evidence established that the defendant and her husband were the only persons with the opportunity to murder Heather. The evidence overwhelmingly established that defendant either committed the actual killing of Heather or aided and abetted substantially in the planning and murder of Heather, and that she had to have concealed Heather's body after the murder in order to assert Heather's abduction to the authorities. The defendant was proven guilty of the offenses of murder and concealment of a homicidal death beyond a reasonable doubt.

V. ACCOUNTABILITY JURY INSTRUCTION

The last issue relating to the guilt phase of defendant's trial is that the jury should not have been instructed on the theory of accountability. She contends that the evidence did not show that there was another person who committed the crimes for whose conduct she was accountable. The defendant argues that the prejudice created by the giving of the accountability instructions was manifested when the jury sent out a communication during its deliberations in which the jury asked: "Under instructions of first degree murder; the first proposition—does the Defendant have to perform the act or only be legally responsible for another person who may have performed the act [as defined on two attached sheets.]" We do not find that the jury instructions were erroneous.

Instructions given to a jury in a criminal prosecution must be read as a whole. (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.) If the series of instructions, considered as a whole, fully and fairly set forth the law applicable to the respective theories of the State and the defendant, then the instructions are determined to be sufficient. (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.) An instruction on accountability is error if there is an absence of supporting evidence; however, if the evidence supports the defendant's guilt as a principal and under a theory of accountability, the giving of the accountability instruction is proper. (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 559 N.E.2d 948.) Only slight evidence on accountability, in addition to action as a principal, is needed to justify the giving of an accountability instruction. (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 559 N.E.2d 948.) Further, if the giving of the accountability instruction is unsupported by the evidence, the giving of the instruction is harmless if the evidence is sufficient to prove defendant's guilt as a principal. *People v. Ernst* (1991), 219 Ill. App. 3d 51, 579 N.E.2d 376.

 At the instructions conference, the court accepted the State's instruction defining accountability. In addition, the court also accepted the State's instruction which provided that a person who is legally responsible for the conduct of another can be convicted of the crime even though the other person has not been prosecuted. Both of these instructions were instructions provided under the Illinois Pattern Jury Instructions, Criminal, Nos. 5.03, 5.06 (2d ed. Supp. 1989). The jury was also instructed on the definitions and the issues to be proved by the State for the offenses of murder, concealment of a homicidal death, and obstruction of justice. Out of

these instructions, only the issues instruction for concealment of a homicidal death contained the accountability language, *i.e.*, "or one for whose conduct she is legally accountable." Thus, when considering the instructions as a whole, the jury was instructed only to consider the theory of accountability in relation to the offense of concealment of a homicidal death. Because the evidence presented at trial, although slight, supported the theory that either defendant or her husband concealed the body after Heather's murder, it was proper for the jury to be instructed on the theory of accountability in relation to this offense. In addition, because defendant's version of the events of the night of Heather's alleged abduction was discredited, her husband's corroboration of this implausible explanation created the inference that he helped to conceal or did conceal Heather's death. Further, the defendant's husband testified that neither he nor defendant left the house on May 3 at the time Heather's body was deposited in the trash barrel in Missouri. The jury could have concluded that the defendant's husband was involved in the trip to Missouri to dispose of the body.

We do not agree with the defendant that the jury applied the accountability theory to the offense of murder, as the jury was not instructed to do so. Further, after the jury's communication to the court, the court responded by stating, "You have been instructed as to the law by the court and I cannot supplement the instructions." The jury was instructed to determine if the defendant was guilty as a principal in the offense of murder, and it found the evidence sufficient to find the defendant guilty of this offense. We affirmed the jury's verdict in our foregoing discussion of the reasonable doubt issue. Thus, the giving of the accountability instruction, if erroneous, was harmless error given the sufficiency of the evidence to convict defendant as the principal actor in Heather's death.

## VI. EXCESSIVE SENTENCE

Lastly, defendant, relying on *People v. Bivens* (1987), 163 Ill. App. 3d 472, 516 N.E.2d 738, argues that she did not qualify for a sentence of natural-life imprisonment where, as here, she was charged with murder both as a principal and as an accessory. We find that defendant's reliance upon *Bivens* is misplaced.

In *Bivens*, the defendant was sentenced under the felony-murder provision of the statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)) to natural-life imprisonment pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)). The qualifying factor that the *Bivens* court relied

upon in imposing the sentence was that the murder victim was actually killed by the defendant; however, the prosecutor presented his case from the perspective that the defendant was guilty of murder both as a principal and as an accessory. The jury was provided with general verdict forms, so it was unclear whether the jury found the defendant guilty as the principal or as the accessory. Therefore, the appellate court concluded that, if the jury had found the defendant guilty of murder under the theory of accountability, the qualifying factor that it was the defendant who had actually murdered the victim did not apply and a natural-life sentence could not be imposed.

In the instant case, however, the defendant's sentence was not sought under the same factor as in *Bivens* but was sought under the qualifying factor that her actions were "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1).) In fact, the court in *Bivens* specifically pointed out that "the prosecutor did not contend and the trial court did not find that [the victim's] 'murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty' and thus the life imprisonment sentence was not imposed on that basis." (*Bivens*, 163 Ill. App. 3d at 493, 516 N.E.2d at 751.) Thus, *Bivens* is not dispositive of the defendant's case.

In reviewing the sentence of a defendant, the standard of review is whether the trial court abused its discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) Further, since the imposition of a sentence is one of the most important and sensitive of judicial functions, great weight and deference are given to the judgment of the trial court. (*People v. Generally* (1988), 170 Ill. App. 3d 668, 525 N.E.2d 106.) We also note that, contrary to defendant's assertion, a natural-life sentence can be imposed upon a defendant found guilty of murder on the basis of accountability where the murder was accompanied by brutal and heinous behavior, as it is the nature of the act and not the identity of the actor that permits the sentence. *People v. Foster* (1990), 198 Ill. App. 3d 986, 556 N.E.2d 1214; *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362.

The sentencing statute provides that a natural-life sentence can be imposed upon a defendant where the defendant's conduct is "accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1).) The supreme court held in *People v. La Pointe* (1981), 88 Ill. 2d

482, 431 N.E.2d 344, that this language applied not only to the infliction of torture or unnecessary pain but also to conduct that was "hatefully or shockingly evil[,] grossly bad[,] enormously and flagrantly criminal" and that was "grossly ruthless," "devoid of mercy or compassion[, or] cruel and cold-blooded." (*La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.) Here, we find the evidence supported a finding that defendant's conduct was premeditated and cold-blooded.

■■■ At trial, the evidence revealed that defendant, or an accomplice, smothered defendant's six-week-old infant daughter, Heather, placed her naked body in a trash bag, froze the body, and then deposited the body almost four days later in a trash barrel in a park area less than six miles from defendant's home. Defendant's parents were out of town, a fact known to the defendant several days before their departure, and it was the State's theory that Heather's body had been placed in the defendant's parents' freezer until just before the defendant's parents came home from their trip. (The whereabouts of Heather's body after 8 a.m. on the morning of April 30, when defendant left her house supposedly to go to her sister-in-law's home, to the morning of May 3 will always be a mystery unless defendant elects to reveal such. There was nothing that prevented defendant from bringing the body back to her house after the police left at 11 a.m.) Also, defendant's roommate at the hospital when Heather was born testified that defendant had told her that a masked man had knocked defendant unconscious when she took the trash out and had abducted her other daughter, Loralei, three years prior. This story did not coincide with defendant's description of Loralei's disappearance and death given to the police in 1986; however, it paralleled defendant's description of the events of Heather's death, even though this description was given to the defendant's roommate six weeks before the incident involving Heather. From the foregoing evidence, it can be concluded that Heather's death was contemplated at the time of her birth, and that the defendant premeditated and planned Heather's death so that the defendant would have access to her parents' freezer to hide the body. Further, the defendant's ability, alone or as an accomplice, to murder her own six-week-old daughter without provocation is conduct so cold-blooded it cannot be contemplated. It should also be noted that the jury found defendant's conduct to be exceptionally brutal and heinous when it found her eligible for the death penalty under this qualifying factor; however, the jury found sufficient mitigating factors not to impose this sentence. Thus, the

court's imposition of a sentence of natural-life imprisonment on defendant was not an abuse of discretion.

Finally, we note that in *People v. Nitz* (1993), 242 Ill. App. 3d 209, this court upheld a sentence of life imprisonment for an accessory to a murder who had a clean record. The murder in *Nitz* was not more brutal or heinous than the murder of Heather.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

SHONKWILER, J., concurs.

JUSTICE MAAG,* specially concurring:

I concur in both the reasoning of the main opinion and the result. I write separately, however, to emphasize that counsel should remember that cases are tried in the courtroom, not the pressroom. The job of the media is to gather and report the news. The job of the attorneys is to try their case and represent their clients within the bounds of the law.

In this case, the prosecutor, Mr. Weber, chose to give an interview to the press in midtrial and characterize Dr. Case's testimony as a "surprise." The motive for giving this interview escapes me. The result was an issue on appeal that should have never been an issue.

While I find no fault with the press reporting the interview, I believe that in the future counsel should more carefully consider their remarks and the wisdom of characterizing their own trial ability and strategy in such a self-congratulatory manner.

---

*Justice H. Lewis participated in oral argument. Justice Maag was later substituted on the panel and has read the briefs and listened to the audiotape of oral argument.